IN THE IOWA DISTRICT COURT FOR POLK COUNTY

MABOR MADOL and KAW NGONG, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

vs.

DAN NELSON AUTOMOTIVE GROUP,
d/b/a J.D. BYRIDER SALES, SOUTH
DAKOTA AUTO GROUP, INC., d/b/a J.D.
BYRIDER, SOUTH DAKOTA
ACCEPTANCE CORPORATION, d/b/a J.D.
BYRIDER SALES & CNAC, DAN NELSON
FINANCE SUPER CENTER, CARNOW
ACCEPTANCE COMPANY (CNAC), d/b/a
SOUTH DAKOTA ACCEPTANCE CORP.
and DANIEL A. NELSON,

        Defendants.

No. CL 92453

Date Filed: 4-18-03

**ORIGINAL NOTICE**

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY NOTIFIED that there is now on file in the office of the clerk of the above court a petition in the above-entitled action, a copy of which petition is attached hereto. The Plaintiffs' attorney is CeCelia Ibson Wagner of Smith, Schneider, Stiles & Serangeli, P.C., 604 Locust Street, Suite 1000, Des Moines, Iowa 50309-3715, telephone: 515/245-6789, and facsimile: 515/2441328.

YOU ARE FURTHER NOTIFIED that unless within 20 days after service of this Original Notice upon you, you serve, and within a reasonable time thereafter file, a written motion or answer, appear thereto and defend in the Iowa District Court for Polk County, at the county courthouse in Des Moines, Iowa, judgment by default may be rendered against you for the relief demanded in the petition.

CLERK OF THE ABOVE COURT
Polk County Courthouse
Des Moines, Iowa 50309

NOTE: The attorney who is expected to represent the Defendants should be promptly advised by Defendants of the service of this notice.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at 515/286-3394. (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942.)

**EXHIBIT**

A

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| MABOR MADOL and KAW NGONG, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DAN NELSON AUTOMOTIVE GROUP, d/b/a J.D. BYRIDER SALES, SOUTH DAKOTA AUTO GROUP, INC., d/b/a J.D. BYRIDER, SOUTH DAKOTA ACCEPTANCE CORPORATION, d/b/a J.D. BYRIDER SALES & CNAC, DAN NELSON FINANCE SUPER CENTER, CARNOW ACCEPTANCE COMPANY (CNAC), d/b/a SOUTH DAKOTA ACCEPTANCE CORP. and DANIEL A. NELSON,<br><br>Defendants. | <br>No. CL 92453<br><br><br>**CLASS ACTION PETITION AT LAW AND JURY DEMAND** |

COME NOW the Plaintiffs, by and through counsel of record undersigned, on behalf of themselves and all others similarly situated, and for their Class Action Petition at Law, hereby state as follows:

## PARTIES

1.     Plaintiff and Class Representative, Mabor Madol, is originally from the Sudan, emigrated to the United State of America, and now resides in Des Moines, Iowa.

2.     Plaintiff and Class Representative, Kaw Ngong, is originally from the Sudan, emigrated to the United States of America and now resides in Des Moines, Iowa.

3.    Dan Nelson Automotive Group did and/or does business as J.D. Byrider Sales. Dan Nelson Automotive Group, Inc. has been doing business in Iowa since at least 1996.

4.    Defendant, Dan Nelson Automotive Group, Inc. is, upon information and belief, a corporation organized under the laws of the State of South Dakota. Dan Nelson Automotive Group, Inc. is authorized to and does do business in Iowa.

5.    Defendant, South Dakota Auto Group, Inc., is, upon information and belief, a corporation organized under the laws of the State of South Dakota. South Dakota Auto Group, Inc. did or does business in Iowa and/or other states under the fictitious name J.D. Byrider. South Dakota Auto Group, Inc. has been doing business in Iowa since at least 1996.

6.    Defendant, South Dakota Acceptance Corporation, is, upon information and belief, a corporation organized under the laws of the State of South Dakota. South Dakota Acceptance Corporation is authorized to do business in Iowa and/or did so under the name CarNow Acceptance Company, a/k/a CNAC. South Dakota Acceptance Corp. did and/or does do business in Iowa as J.D. Byrider Sales and CNAC. South Dakota Acceptance Corp. has been authorized to do business in Iowa since at least 1996.

7.    The business organization of Defendant, Dan Nelson Finance Super Center is not ascertainable from readily available sources.   Upon information and belief, however, the Plaintiffs state that Dan Nelson Finance Super Center may be a fictitious or trade name.  Dan Nelson Finance Super Center holds itself out as a separate business entity and is an entity with whom the Plaintiffs and other Class members have dealt in the State of Iowa and perhaps elsewhere.  Documents obtained by the Plaintiffs indicate that other named Defendants sell and/or transfer purported obligations of Class members to Dan Nelson Finance Super Center.

8.    Defendant, the business organization of CarNow Acceptance Company, is not ascertainable from readily available sources.   Upon information and belief, however, the Plaintiffs state that CarNow Acceptance Company (CNAC) may be a fictitious or trade name. CNAC does do business at 2544 Hubbell Avenue, holds itself out as a separate business entity, and is an entity with whom the Plaintiffs and other class members have dealt.   CarNow Acceptance Company did and/or does do business in Iowa as South Dakota Acceptance Corp. CarNow Acceptance Company has been authorized to do business in Iowa since 1996.

9.    The Defendant, Daniel A. Nelson, is, upon information and belief, an individual and resident of the State of South Dakota, residing at Sioux Falls, South Dakota.   Daniel A. Nelson attaches his name to his various business organizations in part for purposes of inducing consumers to believe they are doing business with an individual.   Daniel A. Nelson is President, Secretary and Treasurer of Dan Nelson Automotive Group, Inc.   Daniel A. Nelson is President, Secretary and Treasurer of South Dakota Auto Group, Inc.   Daniel A. Nelson is President, Secretary and Treasurer of South Dakota Acceptance Corp.   Daniel A. Nelson is President, Secretary and Treasurer of CarNow Acceptance Company.

## FACTS COMMON TO ALL CLASS MEMBERS

10.    Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 9 of this Class Action Petition at Law.

11.    On or about November 29, 2002, Plaintiff and Class Representative Mabor Madol visited Dan Nelson Automotive in Des Moines, Iowa, for purposes of shopping for a motor vehicle.

3

12.    Mr. Madol identified a 2000 Honda Civic with 30,000 miles on it as the car he wished to purchase.

13.    The 2000 Honda Civic which Mr. Madol identified, like many cars on the Dan Nelson Automotive car lot, had no price sticker on it.

14.    Mr. Madol was approached by a salesman employee of Dan Nelson Automotive.

15.    The Dan Nelson Automotive salesman inquired regarding Mr. Madol's income. Mr. Madol shared that he was, at the time, paid an hourly rate of $8.00 per hour.

16.    The Dan Nelson Automotive salesman then told Mr. Madol that he could not afford to purchase the 2000 Honda Civic that he had selected because the monthly payments on that vehicle would be $251.00 per month.

17.    The Dan Nelson Automotive salesman told Mr. Madol that the only way he could qualify to purchase a motor vehicle, given his wage status, was to enroll in the Defendant's Credit Re-establishment Program. See Exhibit 1.

18.    Mr. Madol was told that under the Credit Re-establishment Program, he would be required to make twelve (12) monthly payments in a timely fashion on an older vehicle selected for him by the salesman. If, at the end of those twelve months, Mr. Madol wished to select a newer car, he could do so at that time. Mr. Madol was told that the Defendant's Credit Re-establishment Program was the only way he could build the credit he would need to purchase a newer motor vehicle.

19.    While Mr. Madol does speak the English language, it is not his first language. He has difficulty understanding English in its spoken form without adequate time to think about and

reflect on the verbiage of the speaker. He has difficulty reading documents printed in the English language, but can do so given adequate time and translation assistance as needed.

20.     Mr. Madol's lack of command of the Engi...h language is apparent and evident upon first meeting him.

21.     After pitching the Credit Re-establishment Program to Mr. Madol, the Dan Nelson Automotive salesman brought a number of documents to Mr. Madol, which he then directed Mr. Madol to sign.

22.     The documents which the salesman gave to Mr. Madol were papers regarding a 1995 Pontiac Grand Am with 106,000 miles on it. The salesman advised Mr. Madol that this was a car he could afford on his earnings, because the payments on this car were only $133.00 per month versus $251 per month for the Honda Civic.

23.     Mr. Madol was directed by the Dan Nelson Automotive salesman to sign the papers quickly. He did not have adequate time to review the documents, nor were the terms of the documents were not explained to him, nor was he given an opportunity to ask questions. Mr. Madol was not given the opportunity to take the documents with him for purposes of review by someone with a better understanding of the English language and the terms of the documents given to him.

24.     Mr. Madol signed a Motor Vehicle Purchase Agreement on November 29, 2002. The cash price of the 1995 Pontiac Grand Am as reflected on that Motor Vehicle Purchase Agreement was $7,795.00. See Exhibit 2.

25.     The Motor Vehicle Purchase Agreement signed by Mr. Madol reflects a down payment made by him on the vehicle of $800.00. It also reflects a document fee of $35.00 plus

5

taxes and other fees, for a total cash delivered price of $8,347.75 ($7,547.75 after Mr. Madol's $800.00 down payment was applied).

26.     Mr. Madol also signed a Down Payment Refund Agreement on November 29, 2002. By the terms of that agreement, "J.D. Byrider" would refund his down payment under certain terms and conditions. See Exhibit 3.

27.     Mr. Madol, according to the Down Payment Refund Agreement, was required to make a minimum down payment of $500.00 to qualify for the down payment refund offer.

28.     Despite that Mr. Madol tendered an $800.00 down payment, the Down Payment Refund Agreement reflects that his down payment was only $400.00, and therefore did not qualify him for the down payment refund described in that agreement.

29.     Mr. Madol also signed a document headed "CNAC Agreement Form." That form, which Mr. Madol was not allowed to read before signing, contains a number of clauses which restrict Mr. Madol's rights, including , but not limited to:

   a.     According to the CNAC Agreement Form, Mr. Madol is not allowed to take the vehicle he purchased out-of-state without written permission from CNAC;

   b.     The CNAC Agreement Form prohibits Mr. Madol from selling the vehicle without the express written consent of CNAC;

   c.     Mr. Madol, by signing the CNAC Agreement Form, effectively waived his rights to trial by jury and his other rights as guaranteed to him under Iowa law; and

   d.     By signing the CNAC Agreement Form, Mr. Madol was induced to authorize CNAC or its third party assignee to contact or communicate with any third party in an attempt to collect any debt owed by Mr. Madol.

See Exhibit 4.

6

30.     Mr. Madol was also directed to sign an agreement to provide accidental physical damage insurance, which agreement purports to require him to maintain insurance on the vehicle. In the event that Mr. Madol does not maintain insurance, said agreement purports to give CarNow Acceptance Company the right to declare the entire unpaid balance on the sales contract immediately due and payable. See Exhibit 5.

31.     Mr. Madol was also directed to sign a Dispute Resolution Agreement, which agreement purports to require Mr. Mabor to resolve any and all disputes with the "dealer" and assignees through binding arbitration, including claims related to any warranty acquired by Mr. Madol. The Dispute Resolution Agreement also purports to deprive Mr. Madol of his right to trial by jury, unless such claims are valued at less than $10,000.00. See Exhibit 6.

32.     Mr. Madol was not allowed to read the Dispute Resolution Agreement before he signed it.

33.     Mr. Madol was never given a Retail Installment Contract. He was never advised that interest would and did accrue on the purchase price of the vehicle. At the time Mr. Madol signed the documents to purchase the 1995 Pontiac Grand Am, he believed that he had purchased a car for $8,347.75, inclusive of all interest and finance charges.

34.     Mr. Madol was also given a document titled "Due Bill," on which appears the following handwritten notation "Knowledge and disclosure of all contractual items. Nothing but excellent service!" Mr. Madol was directed to sign this Due Bill, which he did. After Mr. Madol's initials appears the phrase "no other written or verbal promises." See Exhibit 7.

35.     Mr. Madol was also given and directed to sign a Limited Power of Attorney regarding taxes, title and licensing for refund of the same from the State of South Dakota. That

document was never explained to Mr. Madol nor was he advised regarding his right to apply for any refunds of any monies from the State of South Dakota. See Exhibit 8.

36.     Mr. Madol made his first $133.00 payment on this 1995 Pontiac Grand Am in January 2003.

37.     Approximately two (2) weeks after Mr. Madol had tendered his first monthly payment on the 1995 Pontiac Grand Am, he received a call from Dan Nelson Auto, demanding an additional payment of $133.00.

38.     Mr. Madol visited Dan Nelson Auto and questioned why he was being asked to make another payment of $133.00 when he had just made a payment in that amount just two weeks prior.

39.     Upon visiting Dan Nelson Auto in January 2003, Mr. Madol learned for the first time that the papers he had signed required him to pay $133.00 every two weeks rather than every month. Mr. Madol protested, explaining that he had been told his car payment was $133.00 per month. Mr. Madol also conveyed that he had been specifically told he could not afford the $251.00 per month for the 2000 Honda Civic which he had originally selected, so now could he afford $266 per month.

40.     The representative of the Defendants told Mr. Madol that he had signed the papers to pay $133.00 every two weeks and there was nothing the Defendants would do about it.

41.     The fair market retail value of the 1995 Pontiac Grand Am at the time Mr. Madol purchased it from the Defendants was approximately $4,800.00. Despite this fair market retail value, the Defendants sold the car to Mr. Madol for the cash delivered price of $8,347.75.

8

42.     Had Mr. Madol received an installment contract such as those received by some members of the class, he would have learned that the Defendants were charging him interest at the rate of 25.95% per annum.

43.     Mr. Madol would have also learned from the installment contract that the contract carried a prepayment penalty.

44.     Including interest and other charges, the total price to Mr. Madol for this vehicle with a retail value of $4,800.00 will be approximately $11,000.00.

## ADDITIONAL FACTS COMMON TO ALL CLASS MEMBERS
## WHO WERE/ARE "CO-SIGNORS" OR "CO-BUYERS"

45.     The Plaintiff, Kaw Ngong, is acquainted with a woman named Adeng Akuar. Ms. Akuar is also originally from the Sudan, emigrated to the United States of America, and at the time of the subject transaction, resided in Des Moines, Iowa.

46.     Adeng Akuar visited Dan Nelson Auto in late September or early October of 2001 for purposes of purchasing a motor vehicle.

47.     Ms. Akuar was directed by the Defendants' sales staff to a 1991 Chevrolet Cavalier and was told that this was the only car on the lot that she could afford.

48.     Ms. Akuar was then directed by the Dan Nelson Automotive representative to provide a list of eight (8) credit references. She listed Mr. Ngong in the first spot on the form provided by the Defendants to her.

49.     Adeng Akuar was told that because of her lack of credit history, she would need to participate in the Defendants' Credit Building Program.

9

50.     Specifically, Ms. Akuar was told that if she made her payments in a timely fashion for twelve (12) months on the 1991 Chevrolet Cavalier, she could return the Cavalier to Dan Nelson Auto and would be given a newer car. Ms. Akuar was told that the payments she made for the first twelve months would effectively be payments on the newer vehicle, not the 1991 Chevrolet Cavalier that was given to her when she left Dan Nelson Automotive.

51.     The documents which Ms. Akuar signed at the time of this transaction reflect that she was sold the 1991 Chevrolet Cavalier for $6,463.75. Ms. Akuar was directed to put $700.00 down, which she did. See Exhibit 9.

52.     Despite that Ms. Akuar put $700.00 down on the 1991 Chevrolet Cavalier, she was given a receipt for only $300.00. See Exhibit 10.

53.     Ms. Akuar was given a Retail Installment Contract, which reflects a down payment of $700.00 as tendered. See Exhibit 11.

54.     The installment contract given by the Defendants to Ms. Akuar reflects an interest rate of 24.95%. The installment contract also contains a prepayment penalty.

55.     The total sale price for the 1991 Chevrolet Cavalier, including interest, finance and other charges, is $8,782.20.

56.     The 1991 Chevrolet Cavalier had a fair market retail value, at the time of the subject transaction, of approximately $1,800.00.

57.     Following Ms. Akuar's initial visit to Dan Nelson Automotive, the Defendants contacted Mr. Ngong, who Ms. Akuar had listed first on her list of credit references. This contact occurred on or about October 1, 2001.

58.     Mr. Ngong was told by the Defendants that because Ms. Akuar had no driver's license, he would need to act as a co-signor for her.

59.     When Mr. Ngong went to Dan Nelson Auto for purposes of acting as a co-signor for Ms. Akuar, the salesman attempted to pitch to him the Defendants' credit building program.

60.     At the time of this transaction, Mr. Ngong had excellent credit. He had purchased and paid off two vehicles of his own since arriving in this country and has been diligently saving money for purposes of purchasing his first home here.

61.     At no time was Mr. Ngong told by the Defendants that he would be the primary obligor on this transaction. He was never told that it was his responsibility to maintain insurance on the vehicle, he was told simply that he was acting as a co-signor, in which role he would have no real responsibilities.

62.     Mr. Ngong was told that if Ms. Akuar missed a payment, the Defendants would call him. If they could not reach Mr. Ngong, they indicated that they would just continue to call people down the list of credit references Ms. Akuar had provided and rely upon the people on the list to collect the debt from Ms. Akuar.

63.     The documents provided to Adeng Akuar reflect a "CarNow Acceptance Company Notice to Co-Buyer," which has been signed by Adeng Akuar. This document purports to inform the co-buyer of his or her rights and obligations. See Exhibit 12.

64.     The CarNow Acceptance Company Notice to Co-Buyer was never tendered to Mr. Ngong.

65.     When Adeng Akuar fell behind on her payments on her vehicle in 2002, the Defendants' staff contacted Mr. Ngong and insisted that he perform their collections work. The

11

Defendants told Mr. Ngong that it was his obligation to force Ms. Akuar to make her car payments.

66.     Mr. Ngong visited Dan Nelson Auto personally in an attempt to clarify the situation, specifically, his purported obligations. This visit was also prompted by the fact that Mr. Ngong had gone to his own bank for purposes of obtaining a new car loan on his own behalf and was advised that he did not qualify for an additional car loan because the loan for Ms. Akuar appeared on Mr. Ngong's credit report as Mr. Ngong's primary obligation.

67.     When Mr. Ngong visited Dan Nelson Auto, he was told that the business would do nothing for him. Mr. Ngong was told that it was his responsibility to collect the payments from Ms. Akuar and tender them to Dan Nelson Auto, and that he must find the money to do so.

68.     The 1991 Chevrolet Cavalier at issue is no longer operating. The car ceased operation sometime in late 2002. When Mr. Ngong shared this fact with Dan Nelson Auto, he was directed to retrieve the car and bring it back to Dan Nelson, which Mr. Ngong did. The Defendants told Mr. Ngong that if he brought the Cavalier back, they would take it and give him a newer, operating, vehicle.

69.     When Mr. Ngong attempted to return the vehicle to Dan Nelson Auto, he was told the company would not take the car back and that he would need to raise another $3,000.00 to $4,000.00 pay off the vehicle despite that well over $2,000.00 had already been paid towards it and despite the fact that the vehicle does not run and was overpriced by more than $6,000.00.

70.     Mr. Ngong was told by the Defendants that he must pay Dan Nelson Auto at least $3,000.00 to have credit and be qualified to enter into any credit transaction at any time in the

future. Mr. Ngong was told that once he does as the Defendants demand, the Defendants' would give him a paper that then allows him to go to a bank and get credit.

71.     On the occasion when Mr. Ngong visited Dan Nelson Auto for purposes of resolving this situation, the Defendants' sales staff attempted to sell him a new car (rather than giving him a newer car in exchange for the 1991 Cavalier as they had provided) but then told Mr. Ngong that he would need to make payments on both the new car and the 1991 Chevrolet Cavalier.

72.     Since that time, the Defendants harassed Mr. Ngong in an attempt to collect on the debt purportedly owed to them by Adeng Akuar. The Defendants' actions have included, but are not limited to, the sending of threatening letters and the reporting of this matter to credit bureaus such that Mr. Ngong's personal credit rating has been seriously and negatively impacted.

73.     Adeng Akuar ceased making payments on the 1991 Chevrolet Cavalier in early 2003. She did so because she had received information from two other customers of the Defendants, both of whom are Sudanese origin, which information was that regardless of how long or how promptly Ms. Akuar made her payments on the 1991 Chevrolet Cavalier, she would never be given the newer vehicle she was promised.

74.     On or about April 10, 2003, Mr. Ngong learned that the 1991 Chevrolet Cavalier was sold at auction for $275. On that date, CNAC's "legal department" wrote Mr. Ngong, demanding the sum of $3,726.16. This amount included $3,911.16 "the principal amount of Mr. Ngong's purported obligation at the time he surrendered the vehicle to the Defendants" minus the $275 in auction proceeds, plus $90.00 in expenses. See Exhibit 13.

## FACTS COMMON TO ALL CLASS MEMBERS
## WHO PURCHASED "WARRANTIES"

75.     At the time of purchasing the 1995 Pontiac Grand Am, Mr. Madol was also told he would need to purchase a limited warranty on the vehicle. Mr. Madol was given two (2) documents in that regard, a document headed "Limited Warranty" and a document entitled "Notice Regarding J.D. Byrider Limited Warranty." See Exhibits 14 and 15.

76.     The notice regarding the warranty requires Mr. Madol to perform manufacturer's recommended maintenance on the vehicle.

77.     Although charges for other area dealerships appear on the notice regarding warranty, Mr. Madol was induced to have his oil changed and routine maintenance done at the "Dan Nelson Inspection Center." Mr. Madol was then directed to initial next to a paragraph on the notice which purports to obligate him for the term of ownership of his vehicle to have all oil changes and vehicle maintenance done only at Dan Nelson Inspection Center/E Car Care.

78.     The term of the warranty is eighteen (18) months.

79.     After purchasing his vehicle, Plaintiff and Class Representative Madol returned to Dan Nelson Auto for purposes of having his oil changed.

80.     Mr. Madol was told at that time that the vehicle's brakes needed repair. Mr. Madol willingly turned the vehicle over for purposes of repair to the brakes, assuming that that work would be covered by the warranty he had purchased.

81.     After the brakes on the 1995 Pontiac Grand Am had been repaired, the Defendants' representatives directed Mr. Madol to pay them some $130.00 for the work.

14

Mr. Madol protested on the grounds that this work was covered by the warranty and service contract he had purchased.

82.    Upon Mr. Madol's protest, the Defendants' representatives told Mr. Madol that the warranty he had purchased does not apply so long as the vehicle is still running.

83.    The Plaintiffs and their legal representative are aware of a number of other individuals who have purchased vehicles from the Defendants, which vehicles have had serious operating defects or flaws.

84.    Each of the above-referenced individuals has also purchased a warranty and service contract from the Defendants.

85.    Upon returning these defective and damaged vehicles to the Defendants for repairs, these individuals have been charged the full cost of the repairs.

86.    In each and every instance, the consumers have been told that the warranties they purchased do not cover the work performed, regardless of the type of work and regardless of the fact that warranties of this nature routinely cover such repairs.

## RULE 1.261, ET SEQ., FACTS

87.    The experiences of Mabor Madol and Adeng Akuar are similar, if not virtually identical, to all consumers who have purchased motor vehicles from the Defendants. Consumers are told by the Defendants which cars to purchase and which cars they can afford. All vehicles sold by the Defendants to consumers are priced well above - sometimes two and three times - the fair market retail value of said vehicles. Consumers are induced by the Defendants to participate in the Credit Rebuilding Program, which benefits only the Defendants and not the consumers.

15

88.     Consumers who are induced to purchase warranties have experiences virtually identical to that of Plaintiff and Class Representative, Mabor Madol, in that they are sold warranties which do not cover the work that needs to be done to the motor vehicles they are induced to purchase. Consumers are induced to purchase vehicles which have inherent defects and flaws which the Defendants know they will either never repair at no cost to the consumer and/or that cannot be repaired.

89.     The experiences of consumers who were and are induced to act as co-signors and/or co-buyers are similar to, if not virtually identical, to that of Kaw Ngong in that said Class members are not advised of their rights and obligations under co-signor and/or co-buyer agreements and, in fact, said persons are designated as primary obligors. Additionally, all consumers are induced to sign away their rights to fair debt collection practices in that the documents they are forced to sign purport to relieve the Defendants from their obligations under law in that regard.

90.     The facts of this Petition support the certification of a class of persons defined as follows:

> All persons who, since 1996, have purchased motor vehicles from the Defendants, which motor vehicles were priced above the fair market retail value for said vehicles, including all consumers who were induced to purchase warranties and/or service contracts on said vehicles and including all persons who were induced to participate in the Defendants' Credit Rebuilding Program. The Class additionally includes consumers who were induced to act as co-signors or co-buyers for other Class members.

91.     Commencement of this class action is proper and appropriate because the class is so numerous or so constituted that joinder of all members, whether or not otherwise required or permitted, is impracticable. Iowa Rule of Civil Procedure 1.261(1) (2003). While it is not

16

known as of the time of the filing of this class action Petition at Law the precise number of Class members, upon information and belief the Plaintiffs and Class Representatives state that the Class will number in the hundreds if not thousands given the fact that the Defendants have been doing business in Iowa since 1996.

92.    There are a number of questions of law and fact common to all members of the Class.    Iowa Rule of Civil Procedure 1.261(2) (2003).    The experiences of the Class Representatives in their dealings with the Defendants are similar if not virtually identical to those experiences of all persons similarly situated who have done business with the Defendants since 1996.    In fact, the Defendants nationally advertise the unique nature of their approach to consumer credit transactions, highlighting the fact that the Defendants do not fairly price their cars, then rely upon consumers to obtain financing but, rather, ascertain the financial wherewithal of the potential consumer, then price the motor vehicles accordingly.

93.    Certification of this matter as a class action is appropriate given that

(a)    The requirements of Rule 1.261 has been satisfied;

(b)    This class action will lead to the fair and efficient adjudication of the controversy; and

(c)    The representative parties fairly and adequately will protect the interests of the Class.

Iowa Rule of Civil Procedure 1.262 (2003).

17

## COUNT I
## VIOLATIONS OF IOWA CODE CHAPTER 537
(All Defendants)

94.     The Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1

through 93 of this Class Action Petition at Law.

95.     The transactions described herein and those to which the Plaintiffs and other class

members were and are parties are consumer credit transactions as defined and contemplated by

Iowa Code § 537.1301 (¶12) (2002).

96.     The Defendants' conduct towards and in dealing with the members of the Class

violates Iowa Code Chapter 537 in a number of particulars, including, but not limited to:

a.      The Defendants' attempts to collect fees and receive additional charges for
        services related to transactions with class members violate Iowa Code § 537.2501
        in that the fees and charges levied are not among those permitted by that section;

b.      To the extent the installment contracts tendered by the Defendants attempt to limit
        the consumer's right to prepay, those provisions violate Iowa Code § 537.2509;

c.      The Defendants do not give proper notice to consumers and/or the notice given by
        the Defendants to the consumers violates the express terms of Iowa Code
        § 537.3203. Specifically,

        i.      Defendants do not give copies of all writings evidencing a consumer credit
                transaction to the consumers;

        ii.     Writings evidencing the consumer's obligation to pay under a consumer
                credit transaction do not contain a clear and conspicuous notice to the
                consumer, that the consumer should not sign before reading;

        iii.    The writings evidencing the consumer's obligation to pay under a
                consumer credit transaction do not reflect that the consumer is entitled to a
                copy of the writing nor are copies of the writings given to consumers;

        iv.     Consumers are not notified of their right to prepay unpaid balances nor are
                they notified of their right to receive a refund of unearned charges in

18

accordance with law, in fact, consumers are told or induced to believe that they cannot prepay; and

    v.    Consumers are not advised as to the specific minimum charge that may be levied at such time as the consumer elects prepayment. In fact, consumers are led to believe that they do not have the right to prepay on their purported obligations.

d.    The Defendants do not deliver or mail to the consumers written receipts for payments made by coin or currency, nor do the Defendants provide periodic statements showing payments received, which conduct violates Iowa Code § 537.3206;

e.    The Defendants' solicitation and purported binding of alleged co-signors or co-buyers violates in a number of respects Iowa Code § 537.3208, to wit:

    i.    These persons are advised that they are obligated to act as co-signor with respect to a consumer credit transaction;

    ii.    The Defendants do not, either before or contemporaneously with signing the separate agreement of obligation, tender to the purported co-signor or co-buyer a separate written notice that contains a completed identification of the debt the person may have to pay;

    iii.    Purported co-signors or co-buyers are not reasonably informed of their obligation with respect to the underlying obligation;

    iv.    The papers tendered to the purported co-signors and co-buyers do not comply with the notice provisions of Iowa Code § 537.3208(2); and

    v.    The purported co-signors or co-buyers are not given notice by the Defendants nor are they given copies of writings setting forth the terms of the debtor's agreement and of any separate agreement of obligation signed by the person purported to be the co-signor or co-debtor.

f.    The Defendants' policies, practices and procedures of advertising violate Iowa Code § 537.3209 in that the solicitations utilized by the Defendants are false, misleading and deceptive with respect to rates, terms and conditions of credit. Specifically:

    i.    The Defendants do not clearly display the price of their vehicles on the vehicles themselves. In fact, the price of a vehicle is determined only after

the Defendants' employees assess the financial wherewithal of the potential consumer;

ii.     Consumers are told that the Defendants' Credit Re-establishment Program will in fact establish or re-establish good credit in favor of the consumer when, in fact, the "program" is nothing more than a device to tie consumers to obligations which they cannot afford and which are oppressive and usurious;

iii.    Consumers are not advised of the periodic interest rate charged by the Defendants nor are the consumers advised that the Defendants' 24.95% interest rate is well in excess of the rate charged in the marketplace, even insofar as consumers with no or poor credit are concerned;

iv.     The Defendants attach terms and obligations to the consumers and to these consumers credit transactions, that the law neither allows nor requires including, but are not limited to, provisions which require the consumer to seek the permission of the Defendants before selling the subject vehicles or taking them out-of-state; and

v.      The prices set by the Defendants for the motor vehicles sold to the class members is well in excess of prices which the market for used motor vehicles supports.   Despite this fact, the Defendants purposely and intentionally represent to consumers that the Defendants' prices represent the values of the vehicles.   These representations are made by the Defendants with full knowledge that the consumers are relying upon these representations and lack the ability or resources to personally ascertain the falsity of the Defendants' representations.

g.     The negotiable instruments utilized by the Defendants lack the conspicuous notice required by Iowa Code § 537.3211.

h.     The Defendants purposely and intentionally attempt to enter into consumer credit transactions, impose finance charges and impose certain terms or conditions which are more onerous than those regularly extended by this and other creditors to certain consumers based upon their race, ethnicity, color, creed and national origin.   Specifically, the Defendants target refugees, immigrants and others for whom English is not the first language.   The Defendants prey upon these particular individuals and exploit their general naivete regarding the American system of consumer credit transactions.   This conduct violates Iowa Code § 537.3311;

i.     The Defendants do not give consumers the right to cure defaults as required by Iowa Code § 537.5110;

j.     The Defendants do not properly give notice of consumers' right to cure defaults as required by Iowa Code § 537.51111; and

k.     The Defendants, in attempting to collect on debts, engage in prohibited practices under Iowa Code § 537.7103, specifically,

    i.     The Defendants utilize illegal threats, coercions or attempts to coerce, including the threat of harm to persons or their property;

    ii.    The Defendants have made false accusations regarding members of the class to credit reporting agencies and/or have threatened to falsely so accuse the consumers. Specifically, the Defendants send letters similar or identical to that attached hereto as Exhibit 13, which letter makes reference to a charged off account and repossession, neither of which occurred in that case and which letter threatens the consumer's ability to obtain a home, car, personal loan or employment;

    iii.   Consumers are manipulated, induced, enticed and duped into signing documents which purport to give the Defendants the right to contact anyone, regardless of their relationship to the consumer, for purposes of collecting upon this consumer's purported obligation to the Defendants;

    iv.    The Defendants engage in conduct which is oppressive, harassing and abusive. For example, when the Defendants are attempting to collect on an alleged debt, they telephone the consumer's place of employment and home persistently and repeatedly and send out threatening and harassing written materials.

    v.     The Defendants disseminate information regarding consumer obligations to persons who have no legitimate purpose in having that information;

    vi.    The Defendants utilize a business, company or organization named for purposes of debt collection other than the true name of the debt collector's business which, under the Code, constitutes fraudulent, deceptive and misleading conduct.

97.    The conduct of the Defendants as more specifically described herein violates the intent and purpose of the Iowa Consumer Credit Code, which is, according to Iowa Code

§ 537.1102, to simplify, clarify and modernize the law governing installment sales and other consumer credit, to provide rate ceilings for creditors, to further consumer understanding of the terms of credit transaction to protect consumers against unfair practices and to conform the Iowa Consumer Credit Transactions to the Truth in Lending Act.

98.    The conduct of the Defendants, as more specifically described herein, is intentional, wanton, reckless and willful in the sense that the Defendants know or certainly should know that their conduct violates Iowa Code Chapter 537 and in the sense that the Defendants exist for purposes of targeting poor and/or minority people for purposes of binding them to consumer credit transactions which are onerous, usurious, manipulative and illegal.

WHEREFORE  and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request this Court enter judgment in favor of the class and against the Defendants on Count I of this Class Action Petition, and providing the Plaintiffs and class members the following specific relief as applicable:

(1)    Rescission of each and every consumer credit transaction entered into between a class member and the Defendants;

(2)    To the extent a class member has already paid the reasonable and fair market retail value of the vehicle purchased, title to that vehicle shall be given to the consumer;

(3)    To the extent that a consumer has tendered more than the reasonable and fair retail market value of the vehicle, the difference between that value and the amount tendered shall be refunded to the consumer and title to the vehicle transferred to the consumer;

(4)    To the extent a class member has not yet paid the reasonable and fair market retail value of a vehicle, the consumer shall be allowed to elect whether he or she wishes to pay that amount or whether he or she wishes rescission of the contract and a full and complete refund of any sums tendered to date;

(5)     Any and all negative comments or reports made to any credit bureau with respect to any member of the class shall be removed at the instruction of the Defendants;

(6)     The Defendants shall refund to the consumers any unlawful fees, charges or other expenses;

(7)     The Defendants shall refund to each and every consumer who purchased a warranty any sums tendered by said consumer to the Defendants for purposes of repairs to motor vehicles which should have covered by the warranties or which were inherent defects in the vehicles at the time the vehicles were sold but which were not disclosed to the consumers;

(8)     To the extent any consumer class member is in possession of a vehicle which was sold to the consumer in a condition which included defects and/or other problems which require repair, the Defendants shall m::.꞊e such repairs at no cost to the class member;

(9)     An additional award of compensatory damages;

(10)    An award of punitive damages in such amount as will punish the Defendants for their conduct and deter such conduct in the future;

(11)    An award of attorney fees and costs; and

(12)    Such further and other relief as this Court deems equitable and proper.

## COUNT II
## VIOLATIONS OF IOWA CODE CHAPTER 538A
**(Dan Nelson Automotive Group, Inc. and South Dakota Auto Group, Inc.)**

99.     Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 98

of this Class Action Petition at Law.

100.    The Defendants are credit service organizations as defined by Iowa Code

§ 538A.2(1) (2002) in that:

a.      The Defendants represent that if consumers purchase vehicles from them and finance said vehicles through the Defendants, CarNow Acceptance Company (CNAC) and/or South Dakota Acceptance Corporation and/or Dan Nelson

Finance Super Center that the consumers' credit record, history or rating will improve; and

b.    The Defendants purport to provide advice or assistance to consumers with regard to the foregoing.

101.    The Defendants have violated Iowa Code Chapter 538A.3 in that the Defendants receive monies as a result of the consumers entering into finance transactions with those entities with whom the Defendants force the consumers to deal, even though the consumers could obtain credit from other sources and even though the credit offered by South Dakota Acceptance Corporation, Dan Nelson Finance Super Center and CarNow Acceptance Company is substantially the same as that available to the general public.

102.    The Defendants violate Iowa Code 538A.3 in that they make and use false or misleading representations in promoting their services as a credit service organization, specifically, that consumers are induced to participate in the Defendants' Credit Rebuilding Program, when said program neither builds credit nor is of any material benefit to the consumers.

103.    The Defendants violate Iowa Code Chapter 538A.3 in that they willfully and intentionally engage, directly and indirectly, in fraudulent and deceptive acts, practices and a course of business by inducing consumers to participate in the Credit Rebuilding Program.

104.    Despite that the Defendants operate as credit service organizations, they do not comply with the requirements for such organizations set forth in Iowa Code §§ 538A.5, 538A.6, 538A.7 and 538A.8.

WHEREFORE and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request this Court enter judgment in favor of the

class and against the Defendants on Count II of this Class Action Petition, and providing the

Plaintiffs and class members the following specific relief as applicable:

(1)    Rescission of each and every consumer credit transaction entered into between a class member and the Defendants;

(2)    To the extent a class member has already paid the reasonable and fair market retail value of the vehicle purchased, title to that vehicle shall be given to the consumer;

(3)    To the extent that a consumer has tendered more than the reasonable and fair retail market value of the vehicle, the difference between that value and the amount tendered shall be refunded to the consumer and title to the vehicle transferred to the consumer;

(4)    To the extent a class member has not yet paid the reasonable and fair market retail value of a vehicle, the consumer shall be allowed to elect whether he or she wishes to pay that amount or whether he or she wishes rescission of the contract and a full and complete refund of any sums tendered to date;

(5)    Any and all negative comments or reports made to any credit bureau with respect to any member of the class shall be removed at the instruction of the Defendants;

(6)    The Defendants shall refund to the consumers any unlawful fees, charges or other expenses;

(7)    The Defendants shall refund to each and every consumer who purchased a warranty any sums tendered by said consumer to the Defendants for purposes of repairs to motor vehicles which should have covered by the warranties or which were inherent defects in the vehicles at the time the vehicles were sold but which were not disclosed to the consumers;

(8)    To the extent any consumer class member is in possession of a vehicle which was sold to the consumer in a condition which included defects and/or other problems which require repair, the Defendants shall make such repairs at no cost to the class member;

(9)    An additional award of compensatory damages;

(10)   An award of punitive damages in such amount as will punish the Defendants for their conduct and deter such conduct in the future;

(11)   An award of attorney fees and costs; and

(12)     Such further and other relief as this Court deems equitable and proper.

## COUNT III
## VIOLATIONS OF FEDERAL TRUTH IN LENDING ACT
### (All Defendants)

105.     Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 104 of this Class Action Petition at Law.

106.     The conduct of the Defendants as more specifically described herein violates the Federal Truth In Lending Act, 15 U.S.C. § 1638(A)(1) et seq.

WHEREFORE and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request this Court enter judgment in favor of the class and against the Defendants on Count III of this Class Action Petition, and providing the Plaintiffs and class members the following specific relief as applicable:

(1)     Rescission of each and every consumer credit transaction entered into between a class member and the Defendants;

(2)     To the extent a class member has already paid the reasonable and fair market retail value of the vehicle purchased, title to that vehicle shall be given to the consumer;

(3)     To the extent that a consumer has tendered more than the reasonable and fair retail market value of the vehicle, the difference between that value and the amount tendered shall be refunded to the consumer and title to the vehicle transferred to the consumer;

(4)     To the extent a class member has not yet paid the reasonable and fair market retail value of a vehicle, the consumer shall be allowed to elect whether he or she wishes to pay that amount or whether he or she wishes rescission of the contract and a full and complete refund of any sums tendered to date;

(5)     Any and all negative comments or reports made to any credit bureau with respect to any member of the class shall be removed at the instruction of the Defendants;

(6)     The Defendants shall refund to the consumers any unlawful fees, charges or other expenses;

(7)     The Defendants shall refund to each and every consumer who purchased a warranty any sums tendered by said consumer to the Defendants for purposes of repairs to motor vehicles which should have covered by the warranties or which were inherent defects in the vehicles at the time the vehicles were sold but which were not disclosed to the consumers;

(8)     To the extent any consumer class member is in possession of a vehicle which was sold to the consumer in a condition which included defects and/or other problems which require repair, the Defendants shall make such repairs at no cost to the class member;

(9)     An additional award of compensatory damages;

(10)    An award of punitive damages in such amount as will punish the Defendants for their conduct and deter such conduct in the future;

(11)    An award of attorney fees and costs; and

(12)    Such further and other relief as this Court deems equitable and proper.

## COUNT IV
## COMMON LAW FRAUD
### (All Defendants)

107.    The Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 106 of this Class Action Petition at Law.

108.    The conduct of the Defendants, as more fully and specifically described herein, was purposeful and deliberate, and engaged in with the intent to defraud and deceive the Plaintiffs and all members of the Class.

109.    The Defendants made the material misrepresentations more fully described herein with the intent that the Plaintiffs and the members of the Class would rely upon said misrepresentations and in and attempt to solicit and secure the Plaintiffs' purchase of motor vehicles and warranties from the Defendants, as well as securing the Plaintiffs' adherence to the financing agreements which they were induced to sign or otherwise agree to.

27

110.    The Defendants knew or should have known that there was a substantial and significant risk and likelihood that the Plaintiffs would rely upon their material misrepresentations.

111.    In making said material misrepresentations, the Defendants did in fact conceal the true facts from the Plaintiffs and the other members of the Class and by so doing intended to induce the Plaintiffs' to enter into consumer credit transactions with the Defendants.

112.    Had the Plaintiffs known the true facts concerning the transactions in which they engaged with the Defendants, they would not have engaged in said transactions.

113.    As a direct and proximate result of the Defendants' conduct, the Plaintiffs have been and will continue to be harmed, as will the general public, more particularly poor and/or minority people who are particularly at risk and especially vulnerable to the predatory tactics of the Defendants.

WHEREFORE and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request this Court enter judgment in favor of the class and against the Defendants on Count IV of this Class Action Petition, and providing the Plaintiffs and class members the following specific relief as applicable:

(1)    Rescission of each and every consumer credit transaction entered into between a class member and the Defendants;

(2)    To the extent a class member has already paid the reasonable and fair market retail value of the vehicle purchased, title to that vehicle shall be given to the consumer;

(3)    To the extent that a consumer has tendered more than the reasonable and fair retail market value of the vehicle, the difference between that value and the amount tendered shall be refunded to the consumer and title to the vehicle transferred to the consumer;

28

(4)     To the extent a class member has not yet paid the reasonable and fair market retail value of a vehicle, the consumer shall be allowed to elect whether he or she wishes to pay that amount or whether he or she wishes rescission of the contract and a full and complete refund of any sums tendered to date;

(5)     Any and all negative comments or reports made to any credit bureau with respect to any member of the class shall be removed at the instruction of the Defendants;

(6)     The Defendants shall refund to the consumers any unlawful fees, charges or other expenses;

(7)     The Defendants shall refund to each and every consumer who purchased a warranty any sums tendered by said consumer to the Defendants for purposes of repairs to motor vehicles which should have covered by the warranties or which were inherent defects in the vehicles at the time the vehicles were sold but which were not disclosed to the consumers;

(8)     To the extent any consumer class member is in possession of a vehicle which was sold to the consumer in a condition which included defects and/or other problems which require repair, the Defendants shall make such repairs at no cost to the class member;

(9)     An additional award of compensatory damages;

(10)    An award of punitive damages in such amount as will punish the Defendants for their conduct and deter such conduct in the future;

(11)    An award of attorney fees and costs; and

(12)    Such further and other relief as this Court deems equitable and proper.

**COUNT V**
**APPLICATION FOR DECLARATORY JUDGMENT**

114.    The Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 113 of this Class Action Petition at Law.

115.    For the reasons more particularly described within this Class Action Petition at Law, the purported contracts between the members of the Class and the Defendants are and should be declared void as a matter of law.

WHEREFORE and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request this Court enter an Order declaring all consumer credit transaction between all Class members and the Defendants void. This request for declaratory judgment is in addition to the other relief sought by this Class Action Petition at Law.

## COUNT VI
## APPLICATION FOR PERMANENT INJUNCTIVE RELIEF

116.    The Plaintiffs adopt and incorporate as if fully set forth herein paragraphs 1 through 115 of this Class Action Petition at Law.

117.    The actions of the Defendants as more particularly described herein have and will to continue to greatly or irreparably injure the Plaintiffs and all members of the Class.

118.    Given the conduct of the Defendants to date, it is highly likely that the Defendants will continue to violate the rights of the Class members.

119.    Specifically, the Plaintiffs and Class members request the Court enter an injunction in the following regard:

(a)    Requiring the Defendants to price the motor vehicles offered by them for sale at prices which are consistent with the fair market retail value of said vehicles;

(b)    Prohibiting the Defendants from offering, discussing or in any other way attempting to induce consumers to enter into the Defendants' Credit Rebuilding Program;

(c)    Dissolving any and all relationships between and among the Defendants;

(d)    Requiring the Defendants to prominently display on each motor vehicle the price of that vehicle;

(e)    Requiring the Defendants to disclose at the earliest practicable opportunity the fact that the Defendants charge interest at the rate of 24.95%;

(f)     Requiring the Defendants to disclose that their 24.95% interest rate is well above that charged elsewhere in the marketplace, even to consumers with poor or no credit;

(g)     Requiring the Defendants to disclose that consumers could well obtain a lower rate of interest elsewhere;

(h)     Requiring the Defendants to disclose that the consumers have the right to obtain financing at any place and/or from any source of their choosing;

(i)     Prohibiting the Defendants from reporting any consumer to any credit reporting bureau until such time as the matters alleged in this Class Action Petition at Law have been fully and finally resolved.

(j)     Prohibiting the Defendants from tendering to any consumer the document headed "CNAC Agreement Form," as well as any document which purports to place upon the consumer the burdens contained therein and/or deprive the consumer of similar rights;

(k)     Prohibiting the Defendants from soliciting the names of individual persons as credit references from consumers;

(l)     Prohibiting the Defendants from tendering to any consumer the Dispute Resolution Agreement, as well as any document which purports to place upon the consumer the burdens contained therein and/or deprive the consumer of similar rights;

(m)     Prohibiting the Defendants from offering warranties and/or service contracts; and

(n)     Requiring the Defendants to disclose to the consumers at the earliest practicable opportunity any and all defects, deficiencies and/or parts or systems in need of repair regarding any and all vehicles, the purchase of which is being contemplated by the consumer.

WHEREFORE and for the reasons stated herein, the Plaintiffs, on behalf of themselves and all other similarly situated, respectfully request this Court enter a permanent injunction in the manner specified herein. This Application for Injunctive Relief is in addition to the other forms of relief sought by this Class Action Petition at Law.

## REQUEST FOR HEARING ON CLASS CERTIFICATION

The Plaintiffs hereby respectfully request, as soon as practicable, a hearing for the determination that this action should be maintained as a class action.

## DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, on behalf of themselves and all others similarly situated, and hereby demand a trial by jury on each and every of the claims asserted within this Class Action Petition at Law.

Respectfully submitted,

CeCelia Ibson Wagner                          PK0009645
SMITH, SCHNEIDER, STILES & SERANGELI, P.C.
604 Locust Street, 10th Floor
Des Moines, Iowa 50309-3715
Telephone:     515/245-6789
Facsimile:     515/244-1328

ATTORNEYS FOR PLAINTIFFS
AND CLASS REPRESENTATIVES

# CREDIT RE-ESTABLISHMENT PROGRAM

In order to re-establish or create a positive credit rating, it is necessary for each customer to follow a few pre-determined guidelines:

- ☑ ALL vehicle payments must be made in a timely manner.
- ☑ No additional derogatory information on credit report such as repossessions, collections, judgements or tax liens.
- ☑ Debt-to-income Ratio must remain below 50%.
- ☑ Job changes must be in similar field or for improving position.
- ☑ Residency changes must be in area, and limited to 2 changes in any one given year.

_Dan Nelson Auto_ hereby agrees to re-consider this application after a term of _12_ to _18_ months if the previous terms and guidelines have been followed. All new information will be submitted to the appropriate lenders for consideration and approval.

X _____     X _11. 29. 02_
    _Applicant Signature_         Date

_____     _11/29/02_
    _Finance Manager Signature_         Date

* I understand that this does not guarantee loan approval. All loan approvals remain the decision of the lender and its appropriate guidelines.

**EXHIBIT**
**1**

# MOTOR VEHICLE PURCHASE AGREEMENT

NO. _____

DATE ___11/29/02___

BUYER MABUR THOKRIEL MADOL

CO-BUYER _____

ADDRESS 527 35TH APT 2

1242 Hubbell Ave

Des Moines, IA   50317

CITY DES MOINES

STATE IA    ZIP 50312-

(515) 263-5200

BUYER'S REGISTRATION MONTH _____   COUNTY _____

SALESPERSON _____

RES. PHONE _____   BUS. PHONE _____

DESCRIPTION OF PURCHASED VEHICLE: ☐ NEW ☒ USED ☐ DEMO ☒ CAR ☐ TRUCK ☐ PROGRAM RENTAL ☐ VAN ☐ ____

STOCK NO. DC873

YEAR 95   MAKE FORD LOC   TO BE DELIVERED ON OR ABOUT 11/29/02   MODEL GRAND AM   BODY TYPE 2DR

V.I.N. 1G2NW15N7SC7663C 5   COLOR GREEN   TRIM _____

| PRICE OF VEHICLE | | $ 7795.00 |
|---|---|---|
| ACCESSORIES | | |

TRADE-IN ALLOWANCE AND OTHER CREDITS: YEAR ___

TRADE-IN MAKE ___   MODEL ___   BODY TYPE ___

PLATE NO. ___   V.I.N. # ___

BALANCE OWED TO ___

ADDRESS ___

| TRADE-IN ALLOWANCE | $ .00 |
|---|---|
| LESS BALANCE OWED | .00 |
| NET ALLOWANCE ON TRADE-IN | 0.00 |
| DEPOSIT OR CREDIT BALANCE | .00 |
| MANUFACTURER'S REBATE (IF ANY) | .00 |
| Down Payment | .00 |
| TOTAL DOWN PAYMENT (TRANSFER TO LEFT COLUMN) | $ .00 |

### BUYER'S TRADE-IN CERTIFICATION

If you are trading in a vehicle, you certify the following:

1. That there is no salvage or repair history on the vehicle title that would affect the value of the vehicle. If there is salvage or repair history on the title, you agree that the dealer may cancel this sale.

2. That to the best of your knowledge, the vehicle was never on a salvage, rebuilt or flood title in this or any other state.

3. That while you have owned the trade-in, its odometer has not been repaired, replaced, tampered with or altered in any way. That the odometer statement, damage disclosure statement, and prior vehicle history which you provided us for your trade-in is true and correct.

4. That the original emission control system (including the catalytic converter) is intact. That the engine and transmission have not been changed from the manufacturer's original specifications. That the trade-in does not have a cracked or defective head, block, power-train or frame.

### DISCLAIMER OF WARRANTY

IF THERE IS A MANUFACTURER'S WARRANTY ON THE VEHICLE YOU ARE BUYING, THE DEALER IS NOT A PARTY TO IT AND IT IS NOT A PART OF THIS CONTRACT. IF WE ARE AUTHORIZED BY THE MANUFACTURER TO PERFORM WARRANTY WORK ON YOUR VEHICLE, WE HOPE THAT YOU ASK US TO PERFORM THE WORK, HOWEVER, THE MANUFACTURER'S WARRANTY IS BETWEEN YOU AND THE MANUFACTURER. AS FAR AS THE DEALER IS CONCERNED, YOU UNDERSTAND THAT THE VEHICLE IS SOLD "AS IS" WITH ALL FAULTS AND THAT WE MAKE NO WARRANTY OF MERCHANTABILITY AND NO WARRANTY THAT THE VEHICLE IS FIT FOR ANY PARTICULAR PURPOSE. (There is additional information in (2) on the back of this contract.)

| | CASH PRICE | $ 7795.00 |
|---|---|---|
| $ 7795.00 | | |
| $ 0.00 | LESS TRADE IN ALLOWANCE | |
| $ 0.00 | LESS MANUFACTURER'S REBATE | |
| $ 7795.00 | TAXABLE AMOUNT | |

| TAX $ 383.75   TITLE FEE $15 LICENSE FEE $ 188.00 | $ 517.75 |
|---|---|
| Document Fee | 35.00 |
| Misc Fee | 0.00 |
| LIEN FILING FEE (credit sale only see (1) on back) | $ ___ |
| TOTAL CASH DELIVERED PRICE | $ 8347.75 |
| LESS TOTAL DOWN PAYMENT (FROM RIGHT COLUMN) | $ 800.00 |
| UNPAID CASH BALANCE DUE ON DELIVERY | $ 7547.75 |

OTHER INFORMATION OR TERMS OF SALE.

You understand that this agreement (including the terms on the back) is an offer to purchase the vehicle described which will become a binding contract once the dealer has signed it. This document represents the complete agreement between you and the dealer regardless of any other oral, written or prior agreements or representations. However, if you are buying a used vehicle, the information you see on the window form for this vehicle is part of the contract and the information on the window form overrides any contrary provision in this contract.

Iowa law requires us to give you the following notice: You understand that liability insurance coverage which would protect you under the Iowa Motor Vehicle and Safety Responsibility Act IS NOT INCLUDED in your purchase of this motor vehicle.

By signing this contract, you are certifying that you are at least 18 years old (if there are two buyers, that at least one of you is 18 years old), that you have read this contract, front and back) and agree to its terms, and that you have received a copy of it.

X _____   Buyer's Signature   X 11-29-02   Date of Birth

Buyer's Driver's License or F.I.D. No. & Soc. Sec. No. if different from Drivers License No.

X _____   Co-Buyer's Signature   _____   Date of Birth

Co-Buyer's Driver's License or F.I.D. No. & Soc. Sec. No. if different from Drivers License No.

Accepted By: _____   Dealer's Authorized Representative

EXHIBIT 2

# CONTRACT TERMS AND CONDITIONS

In this contract, the words "we," "us" and "our" refer to the dealer-seller. The words "you" and "your" refer to the buyer and the co-buyer, if any.

**1. CASH SALE.** You agree to buy the vehicle described on the front of this document for cash. This is not a credit sale and this document is not a credit document. If you obtain financing to purchase the vehicle, you will be required to sign documents which comply with applicable federal and state laws. If you obtain financing to purchase the vehicle, there will be a fee for filing the lien on the title. This fee may be paid to either the dealer or to the lending institution from whom you obtain financing.

**2. WARRANTY DISCLAIMER.** YOU UNDERSTAND THAT THE VEHICLE IS SOLD "AS IS" WITH ALL FAULTS AND THAT WE MAKE NO WARRANTY OF MERCHANTABILITY AND NO WARRANTY THAT THE VEHICLE IS FIT FOR ANY PARTICULAR PURPOSE unless we provide you with a written warranty or service contract within 90 days from the date of this contract. If we do so, any implied warranty will last only as long as the limited written warranty. This provision does not affect any warranties which may be provided by the vehicle manufacturer. If there is a manufacturer's warranty on the vehicle you are buying, we are not a party to it and it is not a part of this contract. The manufacturer's warranty is between you and the manufacturer.

**3. YOUR FAILURE OR REFUSAL TO ACCEPT DELIVERY.** If you refuse or fail to accept delivery of the purchased vehicle, we may keep your cash deposit as liquidated damages. If you had a trade-in, we may sell the trade-in and keep any part of the selling price which we need to reimburse us for losses which we incurred because you did not take delivery.

**4. FAILURE OR DELAY OF DELIVERY.** We are not liable for failure to deliver, or delay in delivery, of the purchased vehicle if the failure or delay is due, in whole or in part, to any cause beyond our control or without our fault or negligence. We are not liable to you for any consequential damages, damages to property, damage for loss of use, loss of time, loss of profits, or income or any other incidental damages arising out of the sale or use of the purchased vehicle.

**5. DEALER'S REMEDIES.** If you fail to perform all of the terms and conditions of this contract, we may exercise any right or remedy granted by law as well as the other remedies described in this contract.

**6. ADDITIONAL DOCUMENTS.** You agree to sign any other documents which are required to transfer title to the trade-in vehicle or the purchased vehicle, including odometer statements, damage disclosure statements, and powers of attorney.

**7. ATTORNEYS' FEES.** If you default on this contract, you will pay all our costs and attorneys' fees and late charges in addition to our damages.

**IF YOU HAVE A TRADE-IN:**
If you are trading another vehicle as part of the price of the vehicle purchased, you agree to the following additional terms.

**8. YOUR WARRANTY OF TITLE TO TRADE-IN.** You must provide us with your vehicle title, correctly assigned to us. You promise that the trade-in vehicle is your property free and clear of any liens or encumbrances except as noted on the front of this contract and that all taxes and registration fees are currently paid. If we are put to any expense with respect to unpaid taxes or registration fees, you will reimburse us upon demand. If we find out that you made any misrepresentation about the trade-in, then you will pay us three times our actual damages as a result of the misrepresentation, plus our costs of collection and attorneys' fees.

**9. AMOUNT DUE ON TRADE-IN.** The "Trade-In Balance Owed" on the front of this contract was provided by your lienholder. If the balance is incorrect due to the fault of the lienholder, the error will be treated as a mutual mistake of fact. In other words, if you owe more money on your trade-in, you will pay us the difference or you can rescind the contract by returning the vehicle. If you owe less, we will pay (or credit) you.

**10. REAPPRAISAL OF TRADE-IN.** If you do not deliver the trade-in to us until the purchased vehicle is delivered to you, then we may reappraise the trade-in at the time that you deliver it to us and the new appraisal will determine the allowance to be made on the vehicle purchased. If the reappraisal is lower than the original appraisal, you may cancel this contract provided you do so before you take delivery of the purchased vehicle and surrender the trade-in.

**IF YOU ARE BUYING A NEW VEHICLE:**
If you are buying a new vehicle, you agree to the following additional terms:

**11. MANUFACTURER'S PRICE REVISION ON NEW VEHICLE.** If you are buying a new vehicle which we do not have in stock at the time you order it and if the manufacturer changes our price of the vehicle model or body type you ordered between the time we signed this contract and the time we delivered the vehicle to you, we have the right to change the price to you. However, if you do not agree to the changed price, you may cancel this contract. If you cancel the contract, we will return your trade-in to you, if it has not already been sold so long as you pay for the cost of reasonable repairs and storage fees. If we have sold your trade-in, we will pay you the amount we received for the trade-in less a selling commission of 15% and any expenses which we incurred in reconditioning, repairing, insuring, storing and selling the vehicle.

**12. MANUFACTURER'S CHANGE OF THE MODEL AND BODY OF THE NEW VEHICLE.** If you are buying a new vehicle and if the manufacturer changes the design, chassis, accessories, body type or parts of the vehicle which you ordered, we will have no obligation to make the same or similar change to the vehicle you ordered either before or after we deliver the vehicle to you.

# DOWN PAYMENT REFUND AGREEMENT

Customer Name: _Mabor Madol_     Stock Number: _D6823_

J. D. Byrider will refund the Customer's down payment after the final payment is paid, under the following terms and conditions:

1. The Customer must apply a minimum down payment of $500.00 to qualify for the down payment refund offer.

2. The down payment shall be defined as any cash that is submitted upon delivery of the vehicle. The down payment shall not include trade in equity or deferred down payments.

3. The down payment refunded shall not exceed $1000.00.

4. The Customer agrees that if ANY payment, during the term of the loan, is delinquent by one day or more, they will no longer be eligible to receive a refund of their down payment. The Customer further agrees that there will be no grace period for loan payments. All payments must be paid in full, on or before the date that they are due. Late payment arrangements, non-sufficient funds, requests for Loan Rewrite, Loan Extension or Due Date Change will violate this agreement and will be considered as late payments.

5. The Customer agrees that loan balance must be paid in full to qualify for down payment refund. Customer will not qualify for refund if any portion of the balance is forgiven, or paid by dealership, due to any form of refinancing through any of our dealership locations or their lenders (i.e. insurance proceeds not paying off balance in full, trading in this vehicle to purchase different vehicle, etc.).

6. It shall be the responsibility of the Customer to notify J. D. Byrider, within 30 days of loan payoff, that that they qualify for a refund. J.D. Byrider will not be responsible for notifying the Customer of their eligibility for a refund.

7. Upon notification of the Customer's request to receive a refund, a detailed analysis of the Customer's account will be made to determine whether the terms of this agreement have been met.

8. A copy of this agreement should be retained by the Customer.

[X] I do hereby understand that my down payment, of $ _400.00_ , does not qualify me for aforementioned down payment refund described in this agreement

[ ] I do hereby understand that my down payment, of $_____, does qualify me for aforementioned down payment refund and agree to and understand the aforementioned terms and conditions of this agreement

X _____  Customer's Signature      X _11-29-02_ Date

Co-Buyer's Signature      Date

Branch Finance or General Manager's Signature      Date

EXHIBIT
3
tabbies

## NAC AGREEMENT FOR ˙ ˙

1.  I understand that I am purchasing a used vehicle and that future mechanical problems may occur. However, I agree that even though I may encounter such problems, I am still obligated to make my payments to CNAC.  *M. M*

2.  I understand that Dan Nelson Finance Super Center will assign all of its rights to the Retail Installment Contract and Security Agreement (hereinafter referred to as "Contract") dated _Nov 29_, 20 _02_ and documents including this agreement to CNAC (CarNow Acceptance Company). I further understand that CNAC may assign the contract to a third-party at some future date.  *M. M*

3.  I understand that CNAC charges a service fee of twenty dollars ($20.00), plus applicable sales tax, for ANY check returned to CNAC by reason of non-sufficient funds or a stop-payment order. I also understand that if a check is not honored by the bank, regardless of the reason, CNAC will require that all future payments be made by way of cash, money order or certified check.  *M. M*

4.  I understand that if at any time I am in default under terms of the Contract, for any reason, I am subject to all legal recourse available under law, which may include repossession of my vehicle and/or the filing of a lawsuit. CNAC may repossess my vehicle at any time should CNAC believe that my vehicle is in danger or at risk. In the event of a repossession, I understand and agree that I will be charged a minimum of two hundred ($200.00) repossession fee.  *M. M*

5.  I agree and acknowledge that should my vehicle be repossessed, I am responsible to pay, or make arrangements to pay, all related expenses and past due payment amounts within the legal time limits. If I fail to do so, then I understand and agree that I shall lose any interest in the vehicle and forfeit any payments that have been applied to my account.  *M. M*

6.  During the term of the Contract, I will immediately notify CNAC or third-party assignee in writing within fifteen (15) days after any changes in the following: Address, Telephone Number, and/or Employment, if different from the Customer Statement that I have completed.  *M. M*

7.  During the term of the Contract, I understand that before I move out of state, I will notify CNAC or third-party assignee in writing thirty (30) days prior to moving and I will obtain written permission to remove the vehicle from the state where I currently reside (at the time of purchase).I further understand that under NO condition can this vehicle be taken outside of the Continental United States during the term of this Contract.  *M. M*

8.  During the term of the Contract, I understand that I must maintain full coverage insurance on said vehicle and that if at any time the vehicle is involved in any type of accident, I will notify CNAC within 24 hours of the accident.  *M. M*

9.  During the term of the Contract, I agree and acknowledge that said vehicle may not be sold, left in care of someone else or encumbered in any way without the expressed written consent of CNAC.  *M. M*

10. The parties, in consideration of entering into the Contract, do hereby waive the right to a trial by jury and the right to change of venue from County and/or Judge in any dispute arising out of the terms of the Contract. The parties further agree that Polk County shall be the venue for any litigation to collect any amounts due and owing pursuant to the Contract. The provisions of this agreement are incorporated into and made a part of the Contract.  *M. M*

11. I hereby authorize CNAC or third-party assignee to contact or communicate with any third-party in attempting to collect this debt.  *M. M*

I/We have read and fully understand the above conditions and do hereby sign this agreement.

Dated this ___29___ day of ___Nov___, 20 _02_

_____            Purchaser _____
CNAC Agent

Co-Purchaser

**EXHIBIT 4**

(DSM, IA - Revised 6/24/02)

# AGREEMENT TO PROVIDE ACCIDENTAL PHYSICAL DAMAGE INSURANCE

To provide protection against serious loss should an accident or damage occur, I understand that my Retail Installment Contract requires that the vehicle be continuously covered with insurance against the risks of fire, theft, comprehensive and collision and not have a deductible exceeding $500.00. The failure to provide such insurance gives CarNow Acceptance Company the right to declare the entire unpaid balance immediately due and payable. Accordingly, I have arranged for the required insurance through the insurance company shown below and have requested that the policy contain a loss payable endorsement in favor of CarNow Acceptance Company. I give CNAC an interest in any insurance funds from any source. The policy is to be mailed to:

CarNow Acceptance Company    Or    Fax To:    515-262-0859
2544 Hubbell Avenue
Des Moines, IA 50317

**Purchaser:**

| Name | First | Middle | Last |
|------|-------|--------|------|
| | Mabor | Thokriel | Madol |
| Address | City | | State |
| | | | |
| Telephone | | | |
| | | | |

**Vehicle Insured:**

| Year | Make | Model | Body | Serial Number |
|------|------|-------|------|---------------|
| 1995 | Pontiac | Grand Am | 2Dr | 1G2NW15MTSC764326 |

| Insurance Agent | | Insurance Company | |
|-----------------|--|-------------------|--|
| Name | | Name | |
| Address | | Policy # | |
| City, State, Zip Code | | Effective Date | From          To |
| Telephone | | Coverage | ___Fire ___Theft ___Collision $ ___          Deductible |

I authorize CarNow Acceptance Company to verify and my agent to disclose this insurance information.

Purchaser:                                      Date: 11-29-02
Confirmation:

| ( ) Agency | ( ) Insurance Company | ( ) Yes          ( ) No |
|------------|----------------------|--------------------------|
| | | CarNow Acceptance Company Loss Payee |
| Confirmed By | Date | Sales Manager/Branch Finance Manager Signature |

Revised 1/14/00

EXHIBIT 5

# DISPUTE RESOLUTION AGREEMENT

In connection with the purchase and sale of the Vehicle described below pursuant to a Buyer's Order and Retail Installment Contract and Security Agreement, and all other agreements entered into in connection with such purchase and sale, including any Service Agreement (referred to together as the "Contracts") the Dealer, Purchaser(s) and all assignees (the "Parties") agree as follows:

With the exceptions described below, the Parties agree to submit all dispute(s) of any kind between them that arise out of, result from, or are in any way connected with the purchase and sale or financing of the Vehicle, for resolution by binding arbitration. For example, this applies to disputes brought under state or federal consumer protection and lending laws, disputes regarding any of the Contracts, and tort claims. Arbitration will be according to the arbitration rules of the American Arbitration Association, but may be administered by an arbitration organization other than the American Arbitration Association. No Party will have the right to go to court or to have a jury trial, or to participate as a representative or member of a class of claimants with regard to any such dispute. Other rights that the Parties would have if they went to court also may not be available in arbitration.

THE PARTIES AGREE THAT THE ONLY DISPUTES AND CLAIMS NOT SUBJECT TO THIS AGREEMENT ARE: 1) DISPUTES IN WHICH THE TOTAL AMOUNT SOUGHT TO BE RECOVERED BY THE CLAIMANT OR CLAIMANTS (INCLUDING ATTORNEYS FEES AND EXPENSES) IS LESS THAN $10,000; 2) CLAIMS RELATING TO REPOSSESSION OR REPLEVIN OF THE VEHICLE; AND 3) CLAIMS AND DISPUTES UNDER THE J.D. BYRIDER LIMITED WARRANTY (IF PURCHASER RECEIVED SUCH A WARRANTY).

Each Party shall pay his, her or its own expenses, including attorneys' fees, and shall bear equally the fees and expenses of the arbitrator. No class action arbitration may be ordered under this agreement, and there shall be no joinder of parties. To the extent permitted by law, the arbitrator(s) shall have no authority toward punitive damages in any dispute. Judgement upon any arbitrator's award may be entered by any court having competent jurisdiction.

The parties agree that the Vehicle purchase involves interstate commerce and that this Dispute Resolution Agreement is governed by the Federal Arbitration Act, 9 U.S.C. sections 1-16, as amended.

If a court or agency of competent jurisdiction determines that any term or provision contained in this agreement is illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect the other terms and provisions of this agreement and the remainder of the agreement shall continue in full force and effect.

FOR ALL DISPUTES COVERED BY THIS AGREEMENT, THE UNDERSIGNED HAVE AGREED TO WAIVE THE UNDERSIGNED(S) RIGHT TO A TRIAL BY JUDGE OR JURY IN ORDER TO COMPLETE THE PURCHASE OR LEASE TRANSACTION ON THIS DATE FOR THE PRICE AND ALL OF THE OTHER TERMS AGREED TO BY THE PARTIES. THIS ARBITRATION SHALL BE IN LIEU OF ANY CIVIL LITIGATION IN ANY COURT AND IN LIEU OF ANY TRIAL BY JUDGE OR JURY.

*READ COMPLETELY BEFORE SIGNING THIS AGREEMENT. THE TERMS OF THIS AGREEMENT AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT UNDERSTAND ANY PROVISION OF THIS AGREEMENT OR THE COSTS, ADVANTAGES OR DISADVANTAGES OF ARBITRATIONS, SEEK INDEPENDENT ADVICE AND/OR CONTACT THE AMERICAN ARBITRATION ASSOCIATION AT (404) 325-0101 BEFORE SIGNING. BY SIGNING YOU ACKNOWLEDGE THAT YOU HAVE READ, UNDERSTAND AND AGREE TO BE BOUND BY EACH OF THE PROVISIONS, COVENANTS, STIPULATIONS AND AGREEMENTS SET FORTH HEREIN ABOVE.*

DATE: 11/29/0

VEHICLE YEAR, MAKE & MODEL: 1995 Pontiac Grand Am

VEHICLE INDENTIFICATION NUMBER: 162NW/5M7SC764326

DEALER                                          PURCHASER(S)

BY:                                             BY:

AGREED TO BY ASSIGNEE CNAC

BY:                                             BY:

EXHIBIT
6

# DUE BILL

VOID
AFTER
THIS DATE

**WORK PROMISED TO BE PERFORMED AT TIME OF SALE**

| DATE | VEHICLE | MAKE | YEAR | CUSTOMER'S NAME | SALESPERSON | STOCK NUMBER |
|------|---------|------|------|-----------------|-------------|--------------|

**PRESENT THIS ORDER WHEN WORK IS TO BE COMPLETED**

1. Knowledge and disclosure of all contractual items.
2. Nothing but excellent service!
3.
4. $???
5.
6.
7. No other written or verbal promises.

Note: The above promised work is the only work to be performed free of charge. Any additional work will be charged for in accordance with the type of warranty issued at time of sale, and will be cash on delivery.
ALL WORK MUST BE DONE IN OUR SHOP



Congrats.

EXHIBIT
7

## ASSIGNMENT/LIMITED POWER OF ATTORNEY

The undersigned hereby stipulate and agree as follows with respect to the vehicle described below:

| 1995 | Pontiac | GrandAm | 162NW15m7SC7LH326 | No873 |
|---|---|---|---|---|
| (Year) | (Make) | (Model) | VIN # | (Stock No.) |

## ASSIGNMENT

CUSTOMER hereby agrees to assign to South Dakota Auto Group, Inc., a South Dakota corporation, d/b/a J.D.BYRIDER SALES  as seller/lender, or any assignee, any right, title and interest in any refund of monies loaned to CUSTOMER or paid on behalf of CUSTOMER for the payment of tax, title and licensing of the above vehicle.  J.D. BYRIDER SALES shall have the exclusive right to apply for any refund of these monies from the State of South Dakota or any other governmental or municipal agency or entity.

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

That I, _Mabor Madol_ , do hereby make, constitute and appoint J.D. BYRIDER my true and lawful attorney in fact for me and in my name, place, and stead, giving unto said J.D. BYRIDER, full power to do and perform all and every act that I may legally do through an attorney in fact, and every proper power necessary to carry out the limited purposes for which this power is granted as hereinafter set forth, with full power of substitution, and hereby ratifying and affirming that which J.D. BYRIDER shall lawfully do or cause to be done by him(her)self by virtue of the power herein conferred as follows:

To endorse, execute and complete documents for the taxes, titling, licensing, or refund of the same for the above described vehicle and all other such acts as are necessary I order to carry out the limited purpose of this Power of Attorney.

Dated this _29_ day of _Nov_ , _2002_ .

X_____
CUSTOMER

_____
WITNESS

_____
FOR J.D. BYRIDER

MABOR     MADOL

Tel: 244 2167



EXHIBIT
8

# MOTOR VEHICLE PURCHASE AGREEMENT

NO. _____

**J.D. BYRIDER**
2544 Hubbell Ave
Des Moines, IA 50317
(515) 262-5200

SALESPERSON _____

| | |
|---|---|
| BUYER | ISAK GARANG NGOUR |
| CO-BUYER | AUENG AKUAR |
| ADDRESS | 1084 36TH STREET APT#2 |
| CITY | DES MOINES |
| STATE | IA |

DATE 10/01/01
ZIP 50311-

BUYER'S REGISTRATION MONTH _____  COUNTY _____
RES. PHONE _____  BUS. PHONE _____

---

**DESCRIPTION OF PURCHASED VEHICLE:** ☐ NEW ☒ USED ☐ DEMO ☒ CAR ☐ TRUCK ☐ PROGRAM RENTAL ☐ VAN

STOCK NO. D4497
YEAR 91   MAKE CHEVROLET   TO BE DELIVERED ON OR ABOUT 10/01/01   MODEL CAVALIER   BODY TYPE 2DR
V.I.N. # 1G1JC1460M7208755   COLOR TAN   TRIM _____

| PRICE OF VEHICLE | $ 6095.00 |
|---|---|
| ACCESSORIES | |

**TRADE-IN ALLOWANCE AND OTHER CREDITS:** YEAR 0

| | MODEL | BODY TYPE |
|---|---|---|
| TRADE-IN MAKE | | |
| PLATE NO. | V.I.N. # | |
| BALANCE OWED TO | | |
| ADDRESS | | |

| TRADE-IN ALLOWANCE | $ 0.00 |
|---|---|
| LESS BALANCE OWED | 0.00 |
| NET ALLOWANCE ON TRADE-IN | $ 0.00 |
| DEPOSIT OR CREDIT BALANCE | |
| MANUFACTURER'S REBATE (IF ANY) | |
| Down Payment | 700.00 |
| **TOTAL DOWN PAYMENT** (TRANSFER TO LEFT COLUMN) | $ 700.00 |

## BUYER'S TRADE-IN CERTIFICATION

If you are trading in a vehicle, you certify the following:

1. That there is no salvage or repair history on the vehicle title that would affect the value of the vehicle. If there is salvage or repair history on the title, you agree that the dealer may cancel this sale.

2. That to the best of your knowledge, the vehicle was never on a salvage, rebuilt or flood title in this or any other state.

3. That while you have owned the trade-in, its odometer has not been repaired, replaced, tampered with or altered in any way. That the odometer statement, damage disclosure statement and prior vehicle history which you provided us for your trade-in is true and correct.

4. That the original emission control system (including the catalytic converter) is intact. That the engine and transmission have not been changed from the manufacturer's original specifications. That the trade-in does not have a cracked or defective head, block, power-train or frame.

| | CASH PRICE | $ 6095.00 |
|---|---|---|
| $ 6095.00 | | |
| $ 0.00 | LESS TRADE-IN ALLOWANCE | |
| $ 0.00 | LESS MANUFACTURER'S REBATE | |
| $ 6095.00 | TAXABLE AMOUNT | |
| TAX $ 384.75 | TITLE FEE $15 LICENSE FEE $ | 1.00 | $ 343.75 |

| Document Fee | 35.00 |
|---|---|
| Misc Fee | 0.00 |
| LIEN FILING FEE (credit sale only see (1) on back) | $ |
| **TOTAL CASH DELIVERED PRICE** | $ 6463.75 |
| LESS TOTAL DOWN PAYMENT (FROM RIGHT COLUMN) | $ 700.00 |
| **UNPAID CASH BALANCE DUE ON DELIVERY** | $ 5763.75 |

OTHER INFORMATION OR TERMS OF SALE.

## DISCLAIMER OF WARRANTY

IF THERE IS A MANUFACTURER'S WARRANTY ON THE VEHICLE YOU ARE BUYING, THE DEALER IS NOT A PARTY TO IT AND IT IS NOT A PART OF THIS CONTRACT. IF WE ARE AUTHORIZED BY THE MANUFACTURER TO PERFORM WARRANTY WORK ON YOUR VEHICLE, WE HOPE THAT YOU ASK US TO PERFORM THE WORK. HOWEVER, THE MANUFACTURER'S WARRANTY IS BETWEEN YOU AND THE MANUFACTURER. AS FAR AS THE DEALER IS CONCERNED, YOU UNDERSTAND THAT THE VEHICLE IS SOLD "AS IS" WITH *ALL FAULTS* AND THAT WE MAKE NO WARRANTY OF MERCHANTABILITY AND NO WARRANTY THAT THE VEHICLE IS FIT FOR ANY PARTICULAR PURPOSE. [There is additional information in (2) on the back of this contract.]

---

You understand that this agreement (*including the terms on the back*) is an offer to purchase the vehicle described which will become a binding contract once the dealer has signed it. This document represents the complete agreement between you and the dealer regardless of any other oral, written or prior agreements or representations. However, if you are buying a used vehicle, the information you see on the window form for this vehicle is part of the contract and the information on the window form overrides any contrary provision in this contract.

Iowa law requires us to give you the following notice: You understand that liability insurance coverage which would protect you under the Iowa Motor Vehicle and Safety Responsibility Act IS NOT INCLUDED in your purchase of this motor vehicle.

By signing this contract, you are certifying that you are at least 18 years old (if there are two buyers, that at least one of you is 18 years old), that you have read this contract, front and back, and agree to its terms, and that you have received a copy of it.

X _____  01-01-110
Buyer's Signature   Date of Birth

Buyer's Driver's License or F.I.D. No. & Soc. Sec. No. if different from Drivers License No.

X _____  _____
Co-Buyer's Signature   Date of Birth

Accepted By: _____
Dealer's Authorized Representative

Co-Buyer's Driver's License or F.I.D. No. & Soc. Sec. No. if different from Drivers License No.

EXHIBIT 9

## CONTRACT TERMS AND CONDITIONS

In this contract, the words "we", "us" and "our" refer to the dealer-seller. The words "you" and "your" refer to the buyer and the co-buyer, if any.

**1. CASH SALE.** You agree to buy the vehicle described on the front of this document for cash. This is not a credit sale and this document is not a credit document. If you obtain financing to purchase the vehicle, you will be required to sign documents which comply with applicable federal and state laws. If you obtain financing to purchase the vehicle, there will be a fee for filing the lien on the title. This fee may be paid to either the dealer or to the lending institution from whom you obtain financing.

**2. WARRANTY DISCLAIMER.** *YOU UNDERSTAND THAT THE VEHICLE IS SOLD "AS IS" WITH ALL FAULTS AND THAT WE MAKE NO WARRANTY OF MER-CHANTABILITY AND NO WARRANTY THAT THE VEHICLE IS FIT FOR ANY PARTICULAR PURPOSE,* unless we provide you with a written warranty or service contract within 90 days from the date of this contract. If we do so, any implied warranty will last only as long as the limited written warranty. This provision does not affect any warranties which may be provided by the vehicle manufacturer. If there is a manufacturer's warranty on the vehicle you are buying, we are not a party to it and it is not a part of this contract. The manufacturer's warranty is between you and the manufacturer.

**3. YOUR FAILURE OR REFUSAL TO ACCEPT DELIV-ERY.** If you refuse or fail to accept delivery of the purchased vehicle, we may keep your cash deposit as liquidated damages. If you had a trade-in, we may sell the trade-in and keep any part of the selling price which we need to reimburse us for losses which we incurred because you did not take delivery.

**4. FAILURE OR DELAY OF DELIVERY.** We are not liable for failure to deliver or delay in delivery of the purchased vehicle if the failure or delay is due, in whole or in part, to any cause beyond our control or without our fault or negligence. We are not liable to you for any consequential damages, damages to property, damage for loss of use, loss of time, loss of profits, or income or any other incidental damages arising out of the sale or use of the purchased vehicle.

**5. DEALER'S REMEDIES.** If you fail to perform all of the terms and conditions of this contract, we may exercise any right or remedy granted by law as well as the other remedies described in this contract.

**6. ADDITIONAL DOCUMENTS.** You agree to sign any other documents which are required to transfer title to the trade-in vehicle or the purchased vehicle, including odometer statements, damage disclosure statements, and powers of attorney.

**7. ATTORNEYS' FEES.** If you default on this contract, you will pay us our costs and attorneys' fees and late charges in addition to our damages.

**IF YOU HAVE A TRADE-IN:**
If you are trading another vehicle as part of the price of the vehicle purchased, you agree to the following additional terms.

**8. YOUR WARRANTY OF TITLE TO TRADE-IN.** You must provide us with your vehicle title, correctly assigned to us. You promise that the trade-in vehicle is your property free and clear of any liens or encumbrances except as noted on the front of this contract and that all taxes and registration fees are currently paid. If we are put to any expense with respect to unpaid taxes or registration fees, you will reimburse us upon demand. If we find out that you made any misrepresentation about the trade-in, then you will pay us three times our actual damages as a result of the misrepresentation, plus our costs of collection and attorneys' fees.

**9. AMOUNT DUE ON TRADE-IN.** The "Trade-in Balance Owed" on the front of this contract was provided by your lienholder. If the balance is incorrect due to the fault of the lienholder, the error will be treated as a mutual mistake of fact. In other words, if you owe more money on your trade-in, you will pay us the difference or you can rescind the contract by returning the vehicle. If you owe less, we will pay you credit you.

**10. REAPPRAISAL OF TRADE-IN.** If you do not deliver the trade-in to us until the purchased vehicle is delivered to you, then we may reappraise the trade-in at the time that you deliver it to us and the new appraisal will determine the allowance to be made on the vehicle purchased. If the reappraisal is lower than the original appraisal, you may cancel this contract provided you do so before you take delivery of the purchased vehicle and surrender the trade-in.

**IF YOU ARE BUYING A NEW VEHICLE:**
If you are buying a new vehicle, you agree to the following additional terms.

**11. MANUFACTURER'S PRICE REVISION ON NEW VEHICLE.** If you are buying a new vehicle which we do not have in stock at the time you order it and if the manufacturer changes our price of the vehicle model or body type you ordered between the time we signed this contract and the time we delivered the vehicle to you, we have the right to change the price to you. However, if you do not agree to the changed price, you may cancel this contract. If you cancel the contract, we will return your trade-in to you, if it has not already been sold so long as you pay for the cost of reasonable repairs and storage fees. If we have sold your trade-in, we will pay you the amount we received for the trade-in less a selling commission of 15% and any expenses which we incurred in reconditioning, repairing, insuring, storing and selling the vehicle.

**12. MANUFACTURER'S CHANGE OF THE MODEL AND BODY OF THE NEW VEHICLE.** If you are buying a new vehicle and if the manufacturer changes (or discontinues) the model, design, chassis, accessories, body type or parts of the vehicle which you ordered, we will have no obligation to make the same or similar change to the vehicle you ordered either before or after we deliver the vehicle to you.

-------------------------- -CASH DOWN RECEIPT- --------------------------------------------

NAME:KAW NGONG

CURRENT DATE:10/01/01                    DATE OF DOWN PAYMENT:10/01/01

Customer#:AAX029
Model:CAVALIER
Make: CHEVROLET
Stock #:D4497

PURCHASE PRICE:              6095.00    DOWN PAYMENT:      300.00

ACCOUNT BALANCE:5795.00



EXHIBIT
10

| RETAIL INSTALLMENT CONT AND SECURITY AGREEM. | Seller | Buyer |
|---|---|---|
| No. 04497 Date 10/01/01 | Byrider - Des Moines 2544 HUBBELL AVE DES MOINES IA 50317 "We" and "Us" mean the Seller above, its successors and assigns. | KIM SPRING IRONS / NIFER 1004 36TH STREET APT#2 DES MOINES IA 50311- "You" and "your" mean each Buyer above, and guarantor, jointly and individually. |

**THIS IS A CONSUMER CREDIT TRANSACTION**

SALE: You agree to purchase from us, on a time basis, subject to the terms and conditions of this contract and security agreement (Contract), the Motor Vehicle (Vehicle) and services described below. The Vehicle is sold in its present condition, together with the usual accessories and attachments.

| Description of Motor Vehicle Purchased | Year 91 Make CHEVROLET Model CAVALIER | VIN 1G1JC1468M7208755 Lic. No./Year ☐ New ☒ Used | Other: |

Description of Trade-In  0    VIN#

SECURITY: To secure your payment and performance under the terms of this Contract, you give us a security interest in the Vehicle, all accessions, attachments, accessories, and equipment placed in or on the Vehicle, together called Property, and proceeds of the Property. You also assign to us and give us a security interest in proceeds and premium refunds of any insurance and service contracts purchased with this Contract.

PROMISE TO PAY AND PAYMENT TERMS: You promise to pay us the principal amount of $ 5763.75 plus finance charges accruing on the unpaid balance at the rate of 24.95 % per year from October 1, 2001 until paid in full. Finance charges accrue on a ___day by___ day basis. You agree to pay this Contract according to the payment schedule and late charge provisions shown in the TRUTH IN LENDING DISCLOSURES. You also agree to pay any additional amounts according to the terms and conditions of this Contract.

☐ MINIMUM FINANCE CHARGE: You agree to pay a minimum finance charge of $ _____ if you pay this Contract in full before we have earned that much in finance charges.

DOWN PAYMENT: You also agree to pay, or apply the Cash Price, on or before today's date, any cash, rebate and net trade-in value described in the ITEMIZATION OF AMOUNT FINANCED. ☐ You agree to make deferred payments as part of the cash down payment as reflected in your Payment Schedule.

**TRUTH IN LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid when you have made all scheduled payments. | TOTAL SALE PRICE The total cost of your purchase on credit, including your down payment of $ 8782.20 |
|---|---|---|---|---|
| % $ | $ | $ | $ | $ 8782.20 |

Payment Schedule: Your payment schedule will be

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 2 | 200.00 | 10/13/01  10/27/01  /   /   / |
| 70 | 115.46 | Bi-weekly beginning on 11/10/01 |

Security: You are giving a security interest in the Motor Vehicle purchased and described above.
☐ Late Charge: If a payment is not made in full within ___ days after it is due, you will be charged ___

Prepayment: If you pay off this Contract early, you ☐ may ☐ will not have to pay a Minimum Finance Charge.
Contract Provisions: You can see the terms of this Contract for any additional information about nonpayment, default, any required repayment before the scheduled date, and prepayment refunds and penalties.

CREDIT INSURANCE: Credit life, credit disability (accident and health), and any other insurance coverage quoted below, are not required to obtain credit and we will not provide them unless you sign and agree to pay the additional premium. If you want such insurance, we will obtain it for you (if you qualify for coverage). We are quoting below ONLY the coverages you have chosen to purchase.

Credit Life: Insured ___ N/A ___
☐ Single ☐ Joint Prem. $ N/A   Term N/A
Credit Disability: Insured ___ N/A ___
☐ Single ☐ Joint Prem. $ N/A   Term N/A

Your signature below means you want (only) the insurance coverage(s) quoted above. If none are quoted, you have declined any coverages we offered.

N/A         N/A
Buyer ___ N/A ___ Date ___ d/o/b ___
N/A
Buyer ___ Date ___ d/o/b ___

PROPERTY INSURANCE: You must insure the Property securing this Contract. You may purchase or provide the insurance through any insurance company reasonably acceptable to us. The collision coverage deductible may not exceed $ N/A - if you get coverage from or through us you will pay $ ___ for ___ of coverage.

This premium is calculated as follows: N/A
☐ $ N/A Deductible, Collision Coverage $ N/A
☐ $ N/A Deductible, Comprehensive Cov. $ N/A
☐ Fire-Theft and Combined Additional Coverage $ N/A

Liability Insurance coverage for bodily injury and motor vehicle damage caused to others is not included in this Contract unless checked and indicated.

ITEMIZATION OF AMOUNT FINANCED
Vehicle Price (incl. sales tax of $ ___ )  $ 6399.75
Service Contract, Paid to: ___  $ 0.00
Cash Price  $ 6399.75
Manufacturer's Rebate  $ -300.00
Cash Down Payment  $ -400.00
Deferred Down Payment $ ___  $ 700.00
  a. Total Cash/Rebate Down  $ 700.00
  b. Trade-In Allowance $ 0.00
  c. Less: Amount owing $ 0.00
  Paid to (includes f.): $ 0.00
  d. Net Trade-In (b. minus c.)  $ 0.00
  e. Net Cash/Trade-In (a. plus d.) $ 700.00
f. Amount to Finance line e. (if e. is negative)  $ 5699.75
Down Payment (e. disclose as $0 if negative)  $ ___
  Unpaid Balance of Cash Price  $ 5699.75
Paid to Public Officials - Filing Fees  $ 9.00
Insurance DOCUMENT FEE  $ 35.00
To: TITLE FEE  $ 20.00
To: MISC  $ 0.00
  $ 64.00
Total Other Charges/Amounts Pd. to Others  $ 64.00
Less: Prepaid Finance Charges  $ 5763.75
  Amount Financed  $ 5763.75
*We may retain or receive a portion of this amount.

NOTICE TO CONSUMER
1. Do not sign this paper before you read it. 2. You are entitled to a copy of this paper. 3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law. 4. If you prepay the unpaid balance, you may have to pay a minimum charge not greater than seven dollars and fifty cents.

BY SIGNING BELOW BUYER AGREES TO THE TERMS ON PAGES 1 AND 2 OF THIS CONTRACT AND ACKNOWLEDGES RECEIPT OF A COPY OF THIS CONTRACT.

ASSIGNMENT: This Contract is assigned
to ___
the Assignee, phone 515-262-3200 . This assignment is made
☐ under the terms of a separate agreement. ☐ under the terms of the ASSIGNMENT BY SELLER on page 2. ☐ This assignment is made
with recourse. Seller, By ___ Date 10/01/01

Signature ___ Date ___
Signature ___ Date ___
Seller By ___

IOWA RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT
© 1995, 1996 Bankers Systems, Inc., St. Cloud, MN Form RG-SHAV-IA 5/20/99

MOTOR VEHICLE - NOT FOR MANUFACTURED HOMES

(page 1 of 2)

**EXHIBIT 11**

## ADDITIONAL TERMS OF THIS CONTRACT AND SECURITY AGREEMENT

**GENERAL TERMS:** You have been given the opportunity to purchase the Vehicle and described services for the Cash Price or the Total Sale Price. The Total Sale Price is the total price of the Vehicle and any services if you buy them over time. You agreed to purchase the Vehicle and services over time. The Total Sale Price shown in the TRUTH IN LENDING DISCLOSURES assumes that all payments will be made as scheduled. Each payment will be first applied to interest accrued up to the time the payment is actually made, then to principal. The actual amount you will pay may be more or less depending on your payment record.

We do not intend to charge or collect, and you do not agree to pay, any finance charge or fee, that is more than the maximum amount permitted for this sale by state or federal law. If you pay a finance charge or fee that is contrary to this provision, we will, instead, apply it first to reduce the principal balance, and when the principal has been paid in full, refund it to you.

You understand and agree that some payments to third parties as a part of this Contract may involve money retained by us or paid back to us as commissions or other remuneration.

You agree this Contract will be governed by the law of the State of Iowa including the Uniform Commercial Code. If any section or provision of this Contract is not enforceable, the other terms will remain part of this Contract.

**BALLOON PAYMENTS:** If any scheduled payment is more than twice as large as the average of earlier scheduled payments, you may refinance that payment when due. This is so on terms as favorable as the terms originally agreed to in this Contract, if you meet our normal credit standards. This right does not apply if your payment schedule is adjusted for seasonal or irregular income.

**PREPAYMENT:** You may prepay this Contract in full or in part at any time. Any partial prepayment will not excuse any later scheduled payments until you pay in full.

A refund of any prepaid, unearned insurance premiums may be obtained from us or from the insurance company named in your policy or certificate of insurance.

**OWNERSHIP AND DUTIES TOWARD PROPERTY:** By giving us a security interest in the Property, you represent and agree to the following:

A. Our security interest will not extend to consumer goods unless you acquire rights to them within 10 days after we enter into this Contract, or they are installed in or affixed to the Vehicle.

B. You will defend our interests in the Property against claims made by anyone else. You will do whatever is necessary to keep our claim to the Property ahead of the claim of anyone else.

C. The security interest you are giving us in the Property comes ahead of the claim of any other of your general or secured creditors. You agree to sign any additional documents or provide us with any additional information we may require to keep our claim to the Property ahead of the claim of anyone else. You will not do anything to change our interest in the Property.

D. You will keep the Property in your possession in good condition and repair. You will use the Property for its intended and lawful purposes. Unless otherwise agreed in writing, the Property will be located at your address listed on page 1 of this Contract.

E. You will not attempt to sell the Property (unless it is properly identified inventory) or otherwise transfer any rights in the Property to anyone else, without our prior written consent.

F. You will pay all taxes and assessments on the Property as they become due.

G. You will notify us of any loss or damage to the Property. You will provide us reasonable access to the Property for the purpose of inspection. Our entry and inspection must be accomplished lawfully, and without breaching the peace.

**DEFAULT:** You will be in default on this Contract if:

A. You fail to make a payment in full when ten days after it is due, or
B. You fail to observe any covenant of this Contract, the breach of which materially impairs the condition, value or protection of our rights in any collateral securing this Contract, or materially impairs your prospect of paying amounts due under this Contract.

If you default, you agree to pay the costs we incur to realize upon any Property and to collect amounts owing, including, without limitation, fees for repossession, repair, storage and sale of the Property securing this Contract. To the extent permitted by the United States Bankruptcy Code, you agree to pay the reasonable attorney fees we incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

If an event of default occurs as to any one of you, we may exercise our remedies against any or all of you.

**REMEDIES:** If this is a consumer credit transaction and you are in default on this Contract, we must provide you with a written notice of your default and your right to cure before we may exercise the remedies described below. You have 20 days after we mail this notice (or 20 days after actual delivery if we use a means other than first class mail) in which to cure the default. We may exercise our remedies only if you fail to cure your default within the time allowed after the notice.

No notice of default and right to cure is necessary, and we may immediately exercise our remedies if you have previously defaulted one or more times within the previous 365 days and have been given a notice of default and right to cure with respect to such default, or you have voluntarily surrendered possession of the collateral and we have accepted it in full satisfaction of this Contract. Further, this notice may not be required prior to our filing a petition to enforce this obligation by attachment of your Property.

If you are in default on this Contract, we have all of the remedies provided by law and this Contract. Those remedies include:

A. We may accelerate the due date of this Contract, making all unpaid principal, accrued interest, and all other agreed charges immediately due.
B. We may pay taxes, assessments, or other liens or make repairs to the Property if you have not done so. We are not required to do this, so. Any amount we pay will be added to the amount you owe us.

## ASSIGNMENT BY SELLER

Seller sells and assigns the Retail Installment Contract and Security Agreement, (Contract), to the Assignee, its successors and assigns, including all its rights, Seller's name, to have all legal or other actions which Seller could have taken under this Contract. Seller gives Assignee full power, either in its own name or in the terms of a separate agreement as indicated on page 1, the terms of this assignment are described in a separate writing(s) and not as provided below.)
Seller warrants:

A. This Contract represents a sale by Seller to Buyer on a time price basis and not on a cash basis.
B. The statements contained in this Contract are true and correct.
C. The down payment was made by theBuyer in the manner stated on page 1 of this Contract and, except for the application of any manufacturer's rebate, no part of the down payment was loaned or paid to the Buyer by Seller or Seller's representatives.
D. This sale was completed in accordance with all applicable federal and state laws and regulations.
E. This Contract is valid and enforceable in accordance with its terms.
F. The names and signatures on this Contract are not forged, fictitious or assumed, and are true and correct.
G. This Contract is vested in the Seller free of all liens, is not subject to any claims or defenses of the Buyer, and may be sold or assigned by the Seller.
H. A completely filled-in copy of this Contract was delivered to the Buyer at the time of execution.
I. The Vehicle has been delivered to the Buyer in good condition and has been accepted by Buyer.
J. Seller has or will perfect a security interest in the Property in favor of the Assignee.

If any of these warranties is breached or untrue, Seller will, upon Assignee's demand, purchase this Contract from Assignee. The purchase shall be in cash in the amount of the unpaid balance (including finance charge) plus the costs and expenses of Assignee for any loss sustained by it because of judicial set-off or as the result of a recovery made against Assignee as a result of a claim or defense Buyer has against Seller.
Seller waives notice of the acceptance of this Assignment, notice of non-payment or non-performance and notice of any other remedies available to Assignee.
Assignee may, without notice to Seller, and without affecting the liability of Seller under this Assignment, compound or release any rights against, and grant extensions of time for payment to be made, to Buyer and any other person obligated under this Contract.
UNLESS OTHERWISE INDICATED ON PAGE 1, THIS ASSIGNMENT IS WITHOUT RECOURSE.

WITH RECOURSE: If this Assignment is made "with recourse" as indicated on page 1, Assignee takes this Assignment with certain rights of recourse against Seller. Seller agrees that if the Buyer defaults on any obligation of payment or performance under this Contract, Seller will, upon demand, repurchase this Contract for the amount of the unpaid balance, including finance charges, due at that time.

---

...and will be due immediately. ...is amount will earn finance charges from the date paid at the rate described in the PROMISE TO PAY AND PAYMENT TERMS section until paid in full.

C. We may require you to make the Property available to us at a place we designate that is reasonably convenient to you and us.
D. We may immediately take possession of the Property by legal process or self-help, but in doing so we may not breach the peace or unlawfully enter onto your premises. We may then sell the Property and apply what we receive as provided by law to our reasonable expenses and then toward your obligations.
E. Except when prohibited by law, we may sue you for additional amounts if the proceeds of a sale do not pay all of the amounts you owe us.

By choosing any one or more of these remedies, we do not waive our right to later use another remedy. By deciding not to use any remedy, we do not give up our right to consider the event a default if it happens again.

You agree that if any notice is required to be given to you of a intended sale or transfer of the Property, notice is reasonable if mailed to your last known address, as reflected in our records, at least 10 days before the date of the intended sale or transfer (or such other period of time as is required by law).

You agree that, subject to your right to recover such property, we may take possession of personal property left in or on the Property securing this Contract and taken into possession as provided above.

**INSURANCE:** You agree to buy property insurance on the Property protecting against loss and physical damage and subject to a maximum deductible amount indicated in the PROPERTY INSURANCE section, or as we will otherwise require. You will name us as loss payee on any such policy on the event of loss or damage to the Property, we may require additional security or assurances of payment before we allow insurance proceeds to be used to repair or replace the Property. You agree that if the insurance proceeds do not cover the amounts you still owe us, you will pay the difference. You may purchase or provide the insurance through any insurance company reasonably acceptable to us. You will keep the insurance in full force and effect until this Contract is paid in full.

If you fail to obtain or maintain this insurance, or name us as a loss payee, we may (but in no event are required to) obtain insurance to protect our interest in the Property. This insurance may include coverages not required of you. This insurance may be written by a company other than one you would choose. It may be written at a rate higher than a rate you could obtain if you purchased the property insurance required by this Contract. We will add the premium for this insurance to the amount you owe us. Any amount we pay will be due immediately. This amount will earn finance charges from the date paid at the rate described in the PROMISE TO PAY AND PAYMENT TERMS section until paid in full.

**OBLIGATIONS INDEPENDENT:** Each person who signs this Contract agrees to pay this Contract according to its terms. This means the following:

A. You must pay this Contract even if someone else has also signed it.
B. We may release any co-buyer or guarantor and you will still be obligated to pay this Contract.
C. We may release any security and you will still be obligated to pay this Contract.
D. If we give up any of our rights, it will not affect your duty to pay this Contract.
E. If we extend new credit or renew this Contract, it will not affect your duty to pay this Contract.

**WARRANTY:** Warranty information is provided to you separately.

**WAIVER:** You waive (to the extent permitted by law) demand, presentment, notice of acceleration, notice of intention to accelerate, protest, notice of dishonor and notice of protest. This means you give up the right to require us to demand payments of the amount due, to give notice that amounts due have not been paid or to give notice that we are making this Contract immediately due. You also waive any defenses based on suretyship or impairment of collateral under Iowa Code § 554.3605.

**THIRD PARTY AGREEMENT:** By signing below you agree to give us a security interest in the Property described in the SALE section. You also agree to the terms of this Contract, including the WAIVER section above, except that you will not be liable for the payments it requires. Your interest in the Property may be used to satisfy the Buyer's obligation. You agree that we may renew, extend, change this Contract, or release any party or property without releasing your interest in the Property. We may take these steps without notice or demand upon you.

You acknowledge receipt of a completed copy of this Contract.

Signature _____  Date _____

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

IF YOU ARE BUYING A USED VEHICLE, THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

© 1995, 1996 Bankers Systems, Inc., St. Cloud, MN  Form RS-SI-MV-IA  7/3/96                     (page 2 of 2)

# CarNow ACCEPTANCE COMPANY
## NOTICE TO CO-BUYER

Borrower _____

_____

_____

Vehicle   *1991 Chevrolet Cavalier*

VIN   *1G1JC14G8M7208755*

You are being asked to guarantee this debt. Think carefully before you do. If the borrower does not pay the debt, you will be responsible. Be sure that you can afford to pay if you must and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not. You may also have to pay any late fees and/or collection costs, which could increase the amount. The creditor can collect this debt from you without trying to collect from the borrower. The creditor can also use the same collection methods against you that can be used against the borrower. If this debt is ever in default, that fact may become a part of your credit record.

The undersigned acknowledges receipt of a true and exact copy of this Notice to Cosigner.

+ *Adong Akuar*
Co-Buyer

+ *12/1/0* 
Date

*Cwat Buhmuin*
CarNow Acceptance Company Agent

EXHIBIT
12

4/10/03



CNAC LEGAL DEPARTMENT

Kaw Garang Ngong & Akuar Adeng
717 E 5th Street
Des Moines, IA. 50309

Re:   CNAC loan #2-24824

Dear Kaw Garang Ngong &,

This letter is to update you on the balance of the above account. The current principal balance of the account is $3726.16. This amount was figured as follow$3911.16 (principal amount of the obligation at the time of repossession or acceleration)-$275.00,(net auction proceeds; 0 if car abandoned or not recovered)+$90.00,(expenses of retaking, preparing for disposition, processing and disposing of vehicle)=$3726.16(remaining deficiency balance).

Please contact me within 10 days of the date of this letter to discuss possible resolutions in regard to this matter. I have many options to offer you such as payment arrangements, lump sum settlements, voluntary wage assignments and others. I strive not only to help you clear up your debt but also start rebuilding your credit report. Presently the charged off account, and repossession have resulted in derogatory information on your credit report which may prevent you from purchasing or obtaining:

> Home
> Car
> Personal Loan
> Job            (many employers pull credit reports on applicants prior to hire)

Garnishing your wages is not our goal, although no contact may result in this type of action being pursued. Many times one thinks just because finances have gone sour that all is lost and there is no way out. Let me lead you down the road to recovery. I will be glad to share my expertise and help you in any way I can, I look forward to hearing from you soon to resolve this matter.

Sincerely,

Kayleen H.
Recovery Specialist              CNAC Legal Department              1-877-862-8304 x335



EXHIBIT
13

# LIMITED WARRANTY

## Customer Information

MABOR THOKRIEL MADOL

Owner's Name

527-35TH APT B

Street Address

DES MOINES          IA       50312-
City                State    Zip Code

(515) 279-6328

Telephone

## Dealer Information

Dealer's Name and Number

2544 HUBBELL AVE

Street Address

DES MOINES          IA       50317
City                State    Zip Code

515/262-4400

Telephone

## Covered Vehicle

116873              95        PONTIAC

Stock Number        Year      Make

102NWJ15M7SC764326

Vehicle Identification Number

KN22SM9KAR
GRAND AM
Model                    Line

106859

Vehicle Mileage at Time of Delivery

11/29/02

Vehicle Sale Date

## Coverage Terms

This limited warranty begins on the vehicle sale date and ends when either the following time or mileage limitation first occurs:

18 MONTHS OR 18,000 MILES

Deductible Amount Per Repair: $ *100.00

I have understood and agreed to the terms and conditions on the front and back side of this agreement. See reverse for explanation of Coverage.

X_____  CUSTOMER'S SIGNATURE          DATE 11-29-02

_____  DEALER AUTHORIZED SIGNATURE     DATE 11/29/02

## IMPLIED WARRANTIES:

The duration of all implied warranties is limited to the coverage period of this Limited Warranty. Some states do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you

## CLAIMS PROCEDURE:

If a mechanical breakdown covered by this limited warranty occurs while this agreement is in force, contact the Dan Nelson Finance Super Center / Dan Nelson Daewoo dealership from which you purchased the vehicle for instructions. The dealership address and telephone number is shown above. You may reach your dealership during normal business hours. The dealer will decide which repair shop does all repair work. Authorization for repairs must be obtained from the Dealer before any diagnosis or repair work begins. *Any diagnosis and repair work performed prior to authorization from the Dealer will not be paid for under this agreement.*

## CUSTOMER'S RESPONSIBILITIES:

Failure to perform the manufacturer's recommended maintenance, or repossession of the vehicle will result in loss of your protection under this agreement. Maintenance records from the date of original delivery supported by receipts indicating dates, mileage, and services performed must be kept by the purchaser and made available to Dan Nelson Finance Super Center / Dan Nelson Daewoo on request, or you will lose all protection under this agreement. Commercial use of the vehicle will also cause you to lose all protection under this warranty. *Towing is not covered. Customer is responsible for all towing costs.*

THIS AGREEMENT IS NOT AN INSURANCE POLICY, IT IS A USED VEHICLE LIMITED WARRANTY AGREEMENT BETWEEN THE DEALER AND THE CUSTOMER.

NONTRANSFERABLE

THIS AGREEMENT IS FOR THE BENEFIT OF THE NAMED CUSTOMER AND IS NOT TRANSFERABLE TO SUBSEQUENT OWNERS.

EXHIBIT 14

## POWERTRAIN REPAIRS COVERED

Upon payment of the deductible amount per repair, Dealer will pay for repairs to the following components in the event of a mechanical breakdown during the coverage period. Replacement of any part may be made with new parts or with used or reconditioned parts of like kind and quality at the time of breakdown, at the option of the Dealer. Repairs are limited to the NADA wholesale value of the vehicle prior to the breakdown of the covered component. Further, the total of all repairs paid or payable pursuant to this Agreement shall not exceed the price paid for the vehicle.

### ENGINE
All internal lubricated parts, cylinder block and heads, fuel pump, oil pump, thermostat, timing chain cover, timing gears and chain and water pump. (Not included are the carburetion and gasoline or diesel fuel injection components.)

### FRONT-WHEEL DRIVE
Axle shafts, final drive housing and internal parts, front-wheel bearings, universal and constant velocity joints.

### TRANSMISSION
All internal lubricated parts, torque converter and transmission case.

### REAR-WHEEL DRIVE
Axle shafts, drive axle housing and internal parts, drive shaft, rear-wheel bearings, retainers, universal and constant velocity joints.

## WHAT IS NOT COVERED

This warranty will cover only those items listed under "Powertrain Repairs Covered" and does not cover anything else such as the following: (Please initial each appropriate box after reading.)

[M] Towing costs, storage costs, incidental or consequential damages or loss caused by breakdown of components, or otherwise including property damage, personal injury, inconvenience, loss of vehicle use, or commercial loss. Punitive damages are also expressly excluded. The selling Dealer expressly disclaims all expressed warranties other than this Limited Warranty. The duration of all implied warranties is limited to the coverage period of this Limited Warranty. Some states do not allow limitations on how long an implied warranty lasts. So the above limitation may not apply to you. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion my not apply to you. This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

[M] Repairs required because of collision, abuse, overheating operation without proper lubrication or coolant, road conditions, misuse, negligence, alterations, racing accidents, fires, floods, riots, acts of God, vandalism, upset, theft, lack of reasonable and proper maintenance, towing or improper load capacity, continued operation of an impaired vehicle, or any other losses normally covered by casualty insurance. Any repair for the purpose of correcting the engine compression or correcting oil consumption when a mechanical breakdown has not occurred. Valve grinding and/or replacement of worn rings. Repairs beyond those required to correct the covered failure. Repairs of components which have been modified or added to the vehicle after purchase, any repairs on vehicles whose mileage has been altered or whose odometer has been tampered with. Repairs to air conditioning and/or heating components. Repairs made outside the continental United States unless you obtain a written waiver to this condition from the selling Dealer.

### IMPLIED WARRANTY

**Mechanical**
Service adjustments/cleaning, carburetor, throttle body assembly injectors, contaminated fuel system, air conditioning recharge, refrigerant, coolant, battery and cables, belts, hoses, tracks (front hubs, drums, shoes, lining, disc rotors and pads), exhaust system (including catalytic converter), filters, fluids, light (bulbs, sealed beam and lenses). Electrical and electronic components, such as battery, alternator, and starter and wiring harnesses, lubricants, manual clutch disc, strut and strut inserts, shock absorbers, spark/glow plugs and wires, squeaks and rattles, tune-ups, wheel balancing, and/or wheel alignment, wheel studs, wiper blades, shop supplies and hazardous waste removal. Repairs, retrofit, or replacement of any components caused by or due to compliance with any present or future law or legislation including but not limited to the 1990 Clean Air Act.

**Exterior**
Service adjustments (glass and body parts), bright metal, bumpers, body panels, door handles, hinges, glass, moldings, outside ornamentation, convertible or vinyl tops, paint, rust, sheet metal, sideview mirrors (glass and housing), air and water leaks, weatherstrip, wheel cover/ornaments and wind noise. Physical damage, alignment of bumper and body parts.

### CUSTOMER'S SERVO

**Interior**
Buttons, carpet, dash pad, door and window handles, knobs, rearview mirror (glass and housing), trim, and upholstery. Radios, tape players, compact disc players, graphic equalizers, speakers, cellular telephones, theft deterrent systems, and radar or laser detectors.

[M] $100 Deductible Per Occurrence

**Choice of Law**
This Limited Warranty is governed by the laws of the State in which the dealer is located.

3 months / or 3000 miles

## NOTICE REGARDING J.D. BYRIDER LIMITED WARRANTY

As a condition of the J.D. Byrider Limited Warranty, you are required to perform the manufacturer's recommended maintenance, which includes oil changes every three months or 3000 miles. The following is an oil change price list comparing Dan Nelson Inspection Center to others in the area:

Gabus Ford charges $ 28.03
Midas charges $ 19.99
Dewey Fast Lube charges $ 19.95

$17.95 is all you pay at
Dan Nelson Inspection Center

_m m_ I want to take advantage of the service and prices. I intend to have Dan Nelson Inspection Center/E Car Care change my oil and maintain my vehicle and automatically update my warranty records, and would like to be contacted for my first appointment.

_____ I have been offered the above prices and services for oil changes, yet still intend to take my vehicle elsewhere to have my oil changed and maintained. I will keep all computer-generated receipts to validate my warranty should I have a warranty claim.

Maintenance records from the date of original delivery, supported by the receipts indicating the dates, mileage, and services performed must be kept and made available to the service center upon request. **FAILURE TO DO SO WILL VOID THE LIMITED WARRANTY AND YOU WILL LOSE ALL PROTECTION UNDER THE AGREEMENT.** If you do not have the maintenance performed at our dealership, you must provide proof of the service, the date of service and the work performed, or the Limited Warranty becomes void.

By signing below, each party acknowledges that they have read and fully understand the information contained in this notice.

X_____
BUYER

X__11-29-02____
DATE

_____
CO-BUYER

_____
DATE

_____
AUTHORIZED DEALER SIGNATURE

_11/29/02_
DATE



EXHIBIT
15

# Action Process Serving

304 N. Nesmith Ave. ~ Sioux Falls, SD 57103-1315
Phone 605-360-2881 ~ Email rpr3@yahoo.com

April 21, 2003

Smith, Schneider, Stiles & Serangeli, P.C. ( Attn: Patti Stober )
604 Locust St. Suite 1000
Des Moine, Iowa 50309-3715

## RETURN OF SERVICE: MADOL and NGONG, et al. v. DAN NELSON AUTOMOTIVE GROUP, et al.   ( # CL92453 )

I RANDY ROBER DO CERTIFY THAT ON 4/21/03 @ 4:05 PM, I DID PERSONALLY HAND DELIVER FILED STAMPED TRUE AND CORRECT COPY (IES) OF CLASS ACTION PETITIONS AT LAW AND JURY DEMAND AND ORIGINAL NOTICE, IN THE ABOVE MENTIONED CASE TO A PERSON WHO IDENTIFIED THEMSELVES TO ME AS DANIEL NELSON. SAID PERSON BEING SERVED AT 2908 W. 11th ST., SIOUX FALLS, SD.

RANDY ROBER

| FEE: | $25.00 | |
| 2nd SERVE: | $0.00 | |
| MILEAGE: | $1.25 | ( 5 @ .25 ) |
| TAX: | $1.58 | |

**TOTAL DUE:** $27.83

**DUE UPON RECEIPT.** NO FURTHER INVOICE WILL BE ISSUED. PLEASE MAKE CHECK PAYABLE TO: ACTION PROCESS SERVING. THANK YOU FOR YOUR BUSINESS AND PROMPT PAYMENT.

APR 2 3 2003